PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: ANNA S. LITTON,

        *Debtor.*

---

ANNA S. LITTON,

        *Debtor-Appellant,*

    v.

WACHOVIA BANK,

        *Creditor-Appellee,*

JO S. WIDENER,

        *Trustee-Appellee.*

No. 02-1423

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
Glen M. Williams, Senior District Judge.
(CA-01-48, BK-00-3809-WSA)

Argued: February 27, 2003

Decided: May 27, 2003

Before MICHAEL, KING, and SHEDD, Circuit Judges.

---

Vacated and remanded with directions by published opinion. Judge King wrote the majority opinion, in which Judge Michael joined. Judge Shedd wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Robert Tayloe Copeland, COPELAND & BIEGER, P.C., Abingdon, Virginia, for Appellant. Andrew Major Hanson, PENN,

STUART & ESKRIDGE, Abingdon, Virginia, for Appellees. **ON BRIEF:** Mark L. Esposito, PENN, STUART & ESKRIDGE, Bristol, Virginia, for Appellees.

---

## OPINION

KING, Circuit Judge:

Anna S. Litton appeals the district court's decision affirming dismissal of her Chapter 13 bankruptcy petition. *See In re Litton*, 275 B.R. 259 (W.D. Va. 2002). Mrs. Litton maintains that the court erred in ruling that her proposed plan was an impermissible modification of a debt that she and her husband owed to Wachovia Bank, N.A. ("Wachovia"). Because Mrs. Litton's proposed plan does not constitute an impermissible modification, we vacate the district court's dismissal and direct that it remand Mrs. Litton's petition to the bankruptcy court for further proceedings.

I.

This appeal arises from the third in a series of bankruptcy proceedings initiated in the Western District of Virginia by Mrs. Litton and her husband. The resolution of this appeal turns initially on our assessment of the intended meaning of a term used in an earlier court-approved settlement agreement that prohibited the Littons from seeking any modification of a debt they owed Wachovia. Because we conclude that the no-modification provision of the settlement agreement embodies the concepts contained in § 1322 of the Bankruptcy Code, we must decide whether Mrs. Litton's proposed plan of reorganization seeks to "modify" the terms of that agreement or, alternatively, seeks to "cure" the Litton's default of their obligations to Wachovia. While a modification would indeed be prohibited by the provisions of 11 U.S.C. § 1322(b)(2), a cure is expressly authorized under 11 U.S.C. § 1322(b)(5).[1]

---

[1] Pursuant to Chapter 13, a proposed plan may "*modify* the rights of holders of secured claims, *other than* a claim secured only by a security interest in real property that is the debtor's principal residence." 11

## A.

As an initial matter, it is necessary to review certain fundamental concepts of bankruptcy law. Under Chapter 13 of the Bankruptcy Code,[2] individuals with regular income may petition a bankruptcy court for bankruptcy protection and for reorganization of their debts.[3] After a Chapter 13 petition has been filed, all claims against the petitioning debtor's assets are automatically stayed. *See* 11 U.S.C. § 362(a). A trustee, appointed by the government, oversees the administration of the debtor's assets, or the "bankruptcy estate." *See id.* § 704. After filing a Chapter 13 bankruptcy petition, a debtor must propose a "plan of reorganization," which is scrutinized both by the bankruptcy court and by the parties-in-interest, i.e., the debtor's creditors and the bankruptcy trustee, in a confirmation hearing. *See id.* § 1324. At the confirmation hearing, the parties-in-interest are entitled to object to the court's confirmation of the proposed plan. *Id.* If the proposed plan is confirmed by the bankruptcy court, and if the debtor complies with the plan's terms, the debtor obtains a discharge of his debts.

---

U.S.C. § 1322(b)(2) (emphasis added). Because the Littons' debt to Wachovia is secured by their principal residence, § 1322(b)(2) prohibits Mrs. Litton from modifying the debt through bankruptcy proceedings.

A plan of reorganization may, however, "notwithstanding paragraph (2) of this subsection, provide for the *curing* of any default within a reasonable time and maintenance of payments while the case is pending on any . . . secured claim on which the last payment is due after the date on which the final payment under the plan is due." *Id.* § 1322(b)(5) (emphasis added).

[2]Chapter 13 of the Bankruptcy Code is codified in Title 11 of the United States Code.

[3]This appeal focuses primarily on Chapter 13 of the Bankruptcy Code, which differs in some respects from Chapters 7 and 11 of the Code. Chapter 7 provides a liquidation mechanism for "taking control of the property of the debtor, selling it, and distributing the proceeds to creditors in accordance with the distribution scheme of the Code." 1 *Collier on Bankruptcy* ¶ 1.03 (15th ed., rev. 2003). Chapter 11, like Chapter 13, is available for use by individuals. Unlike Chapter 13, however, Chapter 11 is also available for use by partnerships and corporations. Indeed, Chapter 11 is primarily used by business debtors. *Id.*

In proposing a plan of reorganization under Chapter 13, a debtor may seek to "catch up" on past-due payments or, in certain circumstances, to alter the terms of a debt. By contrast, a Chapter 13 plan of reorganization that includes a debt secured by a lien on the debtor's principal residence may not propose to *modify* the terms of that debt. *Id.* § 1322(b)(2). A proposed plan may, however, seek to *cure* "any default," including a default on a claim secured by the debtor's principal residence. *Id.* § 1322(b)(5). With this background in mind, we turn to the relevant facts and procedural history of this appeal.

### B.

The Littons live on and operate a small farm in Washington County, Virginia. They also own and manage several rental properties in that area. On May 16, 1988, the Littons granted a deed of trust on their Washington County farm (which is their principal residence) to Central Fidelity Bank. This deed of trust secured repayment of a promissory note in the sum of $193,764. The Littons granted an additional deed of trust to Central Fidelity Bank on September 21, 1990, for the purpose of providing additional security for the promissory note.

After encountering financial difficulties, Mr. Litton filed a petition in bankruptcy on March 23, 1992, seeking relief in the Western District of Virginia under Chapter 11 of the Bankruptcy Code (the "1992 Petition"). In order to dispose of the 1992 Petition, the bankruptcy court entered an agreed order of November 14, 1994, the Non-Material Modification Order, which the Littons and Central Fidelity executed. At some point after the execution of the Non-Material Modification Order, Wachovia purchased the assets of Central Fidelity Bank, including the Littons' promissory note.

Faced with continuing financial difficulties, Mrs. Litton, on September 4, 1997, filed a Chapter 13 bankruptcy petition in the same court (the "1997 Petition"). Similar to their settlement of the 1992 Petition, the Littons, in March of 2000, entered into a settlement agreement with their creditors, including Wachovia. This settlement agreement disposed of the 1997 Petition and augmented the 1994 Non-Material Modification Order. The terms of this agreement were

incorporated into an order entered by the bankruptcy court on March 3, 2000 (the "2000 Order").

Pursuant to the 2000 Order, the Littons were to pay $55,000 to Wachovia on or before June 30, 2000 (the "Initial Payment"). The 2000 Order further provided that, if the Littons made the Initial Payment in a timely manner, Wachovia would refinance the balance of its loan to the Littons. Conversely, if the Littons failed to make the Initial Payment in a timely manner, Wachovia could, under the terms of the 2000 Order, pursue its non-bankruptcy rights and remedies with respect to the deeds of trust on the Littons' real estate, i.e., by implementing foreclosure proceedings on the Littons' farm. Furthermore, the 2000 Order, mirroring the language of § 1322(b)(2), prohibited the Littons from seeking any further *modification* of the "terms of the order" in any future bankruptcy proceeding.

The Littons failed to make the Initial Payment on time, and Wachovia promptly moved to foreclose on the Littons' farm. On November 21, 2000, Mrs. Litton filed this Chapter 13 petition in the Western District of Virginia (the "2000 Petition"), and the automatic stay arising under the Bankruptcy Code halted the foreclosure proceedings. At the time she filed the 2000 Petition, and in accordance with the provisions of § 1321, Mrs. Litton proposed a plan of reorganization, seeking to reorganize her debts and emerge from bankruptcy (the "Plan"). The Plan proposed the reinstitution of the terms of the 2000 Order by obligating Mrs. Litton to resume her payments to Wachovia. In particular, the Plan provided: "[t]he term of this plan shall be three months. . . . Debtor proposes to catch up in arrearages in payments to Wachovia Bank ($55,000) . . . within 30 days, and to make regular payments as called for in the [2000 Order]. . . . The case will then be concluded."

Wachovia objected to confirmation of the Plan, and it also sought relief from the automatic stay. In a separate filing, the Chapter 13 trustee also objected to confirmation of the Plan, and she sought to have the 2000 Petition either dismissed or converted to a Chapter 7 liquidation proceeding. On February 9, 2001, the bankruptcy court entered an order dismissing the 2000 Petition, concluding that it constituted an improper use of Chapter 13. Mrs. Litton promptly sought reconsideration of the bankruptcy court's order, supporting her

request with an affidavit that she jointly executed with her husband. The affidavit explained the extensive efforts that the Littons had made, and the various difficulties they had encountered, in seeking to comply with the 2000 Order.[4] On March 30, 2001, the bankruptcy court denied reconsideration. *See In re Litton*, 276 B.R. 87, 93 (Bankr. W.D. Va. 2001).

Mrs. Litton appealed the bankruptcy court's rulings to the district court for the Western District of Virginia. The district court agreed that the 2000 Petition was an improper use of Chapter 13, and it affirmed the bankruptcy court's dismissal. *See Litton*, 275 B.R. at 264. Mrs. Litton has appealed the district court's order to this Court, and we possess jurisdiction pursuant to 28 U.S.C. § 158(d).

## II.

We review "the judgment of a district court sitting in review of a bankruptcy court de novo, applying the same standards of review that were applied in the district court. Specifically, we review the bankruptcy court's factual findings for clear error, while we review questions of law de novo." *In re Biondo*, 180 F.3d 126, 130 (4th Cir. 1999). Any mixed questions of law and fact are also reviewed de novo. *Carter Enters. v. Ashland Specialty Co.*, 257 B.R. 797, 800 (S.D.W. Va. 2001).

## III.

### A.

The resolution of this appeal turns, first of all, on whether the parties intended the term "modification," as used in the settlement agreement that was incorporated into the 2000 Order, to be interpreted in accordance with the narrow no-modification provision of § 1322, or

---

[4]In their affidavit, the Littons stated that Mr. Litton had negotiated with six separate individuals seeking to sell timber, the proceeds of which were to be used to fund the Initial Payment to Wachovia. The affidavit further asserted that the Littons had lost over 70% of their tobacco crop in 2000, which represented a $15,000 loss of income.

whether they instead intended the term to preclude *all* modifications, even those authorized by § 1322.

Under Virginia law, the cardinal rule applied in the construction of contracts is that the intention of the parties controls.[5] *Paul v. Paul*, 203 S.E.2d 123, 125 (Va. 1974). Where the language in a contract is unambiguous, it is inappropriate for the court to consider extrinsic evidence. *Great Falls Hardware Co. of Reston v. S. Lakes Vill. Ctr. Assocs.*, 380 S.E.2d 642, 643 (Va. 1989). The *Great Falls* court noted that "an unambiguous document should be given its plain meaning." *Id.*; *see also Ross v. Craw*, 343 S.E.2d 312, 316 (Va. 1986) (noting that contracts must be construed as written).

It is unclear whether the Littons and Wachovia intended the no-modification provision of the 2000 Order to be interpreted narrowly or broadly, i.e., to proscribe only certain modifications or to proscribe *all* modifications. A contract is ambiguous when the language employed therein can be "understood in more than one way or refers to two or more things at the same time." *Douglas v. Hammett*, 507 S.E.2d 98, 101 (Va. 1998). Because the prohibition on "modification" contained in the 2000 Order is susceptible to more than one meaning, it is ambiguous. We must, therefore, turn to the subject matter of the 2000 Order, and to the circumstances surrounding its entry, in an effort to discern the parties' true intent. *See Monterey Corp. v. Hart*, 224 S.E.2d 142, 147 (Va. 1976).

It is important — indeed, it is controlling — in this context, that the Littons and Wachovia agreed on the terms of the 2000 Order to settle a pending *bankruptcy* case (the 1997 Petition), and to augment the settlement terms of an earlier *bankruptcy* case (the 1992 Petition). Accordingly, we must conclude that the Littons and Wachovia intended the term "modification," as used in the 2000 Order, to be consistent with the meaning contemplated by § 1322 of the Bank-

---

[5]We apply Virginia law in interpreting the 2000 Order because it was agreed to by the Littons and Wachovia in Virginia. *See Woodson v. Celina Mut. Ins. Co.*, 177 S.E.2d 610, 613 (Va. 1970) ("The nature, validity and interpretation of contracts are governed by the law of the place where made.").

ruptcy Code.[6] Therefore, we must assess the extent and breadth of the no-modification provision of § 1322(b)(2).

B.

On appeal, Wachovia's primary contention in support of the bankruptcy court's dismissal of the 2000 Petition is that the Plan proposes a prohibited modification. By contrast, Mrs. Litton maintains that the Plan constitutes a permissible cure under § 1322(b)(5), and that the 2000 Petition should not have been dismissed. In affirming the bankruptcy court's dismissal of the 2000 Petition, the district court concluded that, because the 2000 Order contained its no-modification provision, the Plan's proposed alterations of the 2000 Order would be impermissible. *See In re Litton*, 275 B.R. at 264.

Because the Littons' debt to Wachovia is secured by an interest in the Littons' primary residence, § 1322 would ordinarily prohibit a modification of the 2000 Order. Nevertheless, a separate provision of the same statute, § 1322(b)(5), provides that the Littons are entitled to cure any default of their obligations relating to the debt on their principal residence.[7] We must therefore resolve whether the Plan

---

[6]Because the 2000 Order does not contain a provision expressly prohibiting the Littons from attempting to "cure" a default, we are not presented with, nor do we take any position on, the question of whether such a prohibition would be valid and enforceable. The parties, by their settlement agreement, merely prohibited "modification" of the 2000 Order, and we limit our inquiry to the interpretations accorded to the concepts of prohibited "modifications" and permissible "cures" under § 1322.

[7]The dissent disputes the applicability of this statutory cure provision. Specifically, the dissent contends that because "the final balloon payment on Wachovia's mortgage was due on January 30, 2000[,]. . . Mrs. Litton cannot rely upon § 1322(b)(5) to authorize any cure in this case." *Post* at 18. We must respectfully disagree. While it is true that the cure provision applies only to secured claims that have yet fully to mature, that restriction presents no impediment to a cure in the case at hand. The 2000 Order, and not the original mortgage, governed the relationship between the Littons and Wachovia. The terms of that Order included the possibility of a repayment period that would extend to 2005, and those terms made no provision for a balloon payment upon default of the Initial Payment. Thus, under the 2000 Order, Wachovia's claim would not fully mature prior to the date of the final payment under the Plan, and the cure provision of § 1322(b)(5) remains applicable.

seeks to "modify" the 2000 Order or, alternatively, whether it seeks to "cure" the Littons' default. In so doing, we must understand the interpretations accorded to the concepts of "modification" and "cure" in Chapter 13 jurisprudence.

### 1.

The bankruptcy courts have consistently interpreted the no-modification provision of § 1322(b)(2) to prohibit any fundamental alteration in a debtor's obligations, e.g., lowering monthly payments, converting a variable interest rate to a fixed interest rate, or extending the repayment term of a note. *See, e.g.*, *In re Schum*, 112 B.R. 159, 161-62 (Bankr. N.D. Tex. 1990) (concluding that plan was impermissible modification because it proposed to reduce monthly payments and secured valuation). In *In re Gwinn*, 34 B.R. 936, 944-45 (Bankr. S.D. Ohio 1983), the court approved a plan as a permissible cure under § 1322(b)(5), because the plan did not propose to lower monthly payments, extend the repayment period, or make the obligation conditional. It instead sought only to reinstate the original contract with a minor delay in payment. *Id.*; *see also In re Cooper*, 98 B.R. 294 (Bankr. W.D. Mich. 1989) (finding impermissible modification where plan proposed new payment schedule). Along similar lines, another bankruptcy court concluded that confirmation of a Chapter 13 plan would have constituted an impermissible modification because the plan proposed to alter fundamental aspects of the debtor's obligations, i.e., the nature and rate of interest, and the maturity features of the loan. *In re Coffey*, 52 B.R. 54, 55 (Bankr. D.N.H. 1985). As these decisions have emphasized, § 1322(b)(2) prohibits modifications that would alter at least one fundamental aspect of a claim.

### 2.

Conversely, a "cure" merely reinstates a debt to its pre-default position, or it returns the debtor and creditor to their respective positions before the default. In *Landmark Financial Services v. Hall*, 918 F.2d 1150 (4th Cir. 1990), we had occasion to assess the meaning of the term "cure," as it is used in § 1322(b)(5). In that decision, Judge Hall determined that "*a cure reinstates the original pre-bankruptcy agreement of the parties. . . [and] is not a modification of the [creditor's]*

*rights*. Cure by its very nature assumes a regime where debtors reinstate defaulted debt contracts in accordance with the conditions of their contracts." *Id.* at 1154 (emphasis added and internal citations omitted).

Our sister circuits have taken a similar view of the use of the term "cure" in bankruptcy proceedings. For example, the Second Circuit has observed that, "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions." *DiPierro v. Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982). The *DiPierro* court noted that "[w]e do not read 'curing defaults' under (b)(3) or 'curing defaults and maintaining payments' under (b)(5) to be modifications of claims." *Id.* at 27.

The Seventh Circuit has given a similar meaning to the term "cure," as it is used in the Bankruptcy Code. It observed that "[t]he terms 'modify' and 'cure' are nowhere defined in the Bankruptcy Code. However, it is clear that Congress intended 'cure' to mean something different from 'modify.'" *In the Matter of Clark*, 738 F.2d 869, 871-72 (7th Cir. 1984). Significantly, the *Clark* court also observed that, "[o]rdinarily, the means by which one cures a default is by paying all amounts due and owing . . . . Thus, the plain meaning of 'cure,' as used in § 1322(b)(3) and (5), is to *remedy or rectify the default and restore matters to the status quo ante*." *Id.* at 872 (emphasis added); *see also In re Metz*, 820 F.2d 1495, 1497 (9th Cir. 1987) (interpreting "cure" provisions of Chapter 13 as permitting "the debtor to 'cure' (i.e., pay or bring current) arrearages on the debt and thereby reinstate the debt"). Given these definitions and interpretations of the terms "modify" and "cure," as they have been used in bankruptcy proceedings, we next examine whether the Plan would fundamentally alter the terms of the 2000 Order.

## C.

The 2000 Petition was filed on November 21, 2000, when the Littons' only default, under the terms of the 2000 Order, was their failure to make the Initial Payment. By providing for terms of payment virtually identical to those required by the 2000 Order, the Plan simply sought to return the 2000 Order to its pre-default condition. *See Landmark*, 918 F.2d at 1154 (noting that cure reinstates defaulted debt

contract to its original terms). It proposed that Mrs. Litton pay all arrearages and maintain all payments during the life of the Plan. It did not propose the reduction of any installment payments or of the amounts due to Wachovia under the 2000 Order; it did not propose an extension of the final maturity date on the Littons' debt to Wachovia; and it did not propose an alteration of any other terms of the 2000 Order. Under these circumstances, the Plan does not propose a "modification" of the 2000 Order. Rather, evaluated by its express terms, under the foregoing authorities, and by its proposed treatment of the 2000 Order, the Plan constitutes a "cure" under the Bankruptcy Code, in that it seeks to restore the "status quo ante." *Clark*, 738 F.2d. at 872.[8]

## D.

Finally, we briefly assess the district court's alternate bases for affirming the dismissal of the 2000 Petition. First, the court reasoned that, because the 2000 Order provided for certain remedies — namely, foreclosure — in the event of the Littons' default, the Littons were precluded from altering the terms of the 2000 Order by filing for bankruptcy. Contrary to this reasoning, Wachovia's right to institute

---

[8]The dissent maintains that Mrs. Litton's proposed Chapter 13 plan "simply is not a cure" because the Plan "*did* propose an extension of the final maturity date of the Littons' debt to Wachovia, from January 2000 to March 2005. And confirmation of Mrs. Litton's plan *will* place Wachovia in a worse position than it was in under the 2000 Agreement: Wachovia will lose entirely the benefit of holding a matured mortgage, and it will be forced to undertake additional financing obligations on terms more favorable to Mrs. Litton." *Post* at 17 (emphasis in original).

This critique misses its mark, however, because under the terms of the 2000 Order, Wachovia did not hold a matured mortgage: the Order expressly contemplates a repayment period extending to 2005. Thus, rather than depriving Wachovia of "the benefit of holding a matured mortgage," the Plan merely restores the parties to their respective, bargained-for positions under the 2000 Agreement. And while the Plan does effect this restoration without requiring that the Littons furnish additional consideration to Wachovia, such is merely the consequence of Congress's decision to place certain debtor-friendly provisions into the Bankruptcy Code: § 1322(b)(5) does not require that the debtor furnish consideration in exchange for a cure.

foreclosure proceedings is subject to the provisions of the Bankruptcy Code that permit a debtor to file a bankruptcy petition up to the time of a foreclosure sale. *See* 11 U.S.C. § 1322(c)(1). Because the Bankruptcy Code provides the framework within which a creditor may assert contractual remedies in the event of a default, the terms of the 2000 Order do not, of their own accord, preclude Mrs. Litton from filing the 2000 Petition and proposing to cure her default to Wachovia.

Second, the court concluded that, because the Littons did not establish that they had experienced an unforeseen change in circumstances, the dismissal of the 2000 Petition was warranted.[9] A change in circumstances, foreseen or unforeseen, is but one of many factors a court should consider when assessing whether a Chapter 13 petition or plan of reorganization has been filed in "good faith"; it does not constitute an independent test for whether a petition should be dismissed. *See Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986). Because the district court agreed with the bankruptcy court's finding that the 2000 Petition had been filed in good faith, *In re Litton*, 275 B.R. at 263, that petition should not have been dismissed simply because Mrs. Litton had failed to demonstrate an unforeseen change in circumstances.[10]

In sum, the 2000 Petition was filed in good faith and it proposed a permissible cure. In such circumstances, Mrs. Litton was not pre-

---

[9]In requiring Mrs. Litton to establish an "unforeseeable" change in circumstances, the district court appeared to rely on the principle that a confirmed Chapter 13 plan may not be modified without establishing that the debtor experienced a substantial and unanticipated change in circumstances after confirmation of his plan. *See* 11 U.S.C. § 1329; *In re James*, 260 B.R. 368, 374 (Bankr. E.D.N.C. 2001). The unforeseen change-in-circumstances requirement does not control in this matter, however, because Mrs. Litton does not seek to modify a confirmed plan. Rather, she seeks to *cure* a default.

[10]The district court also sought to justify its dismissal on the basis of policy concerns, namely, that confirmation of the Plan would discourage settlements between lenders and debtors. Such policy concerns, however, do not constitute independent "causes" warranting dismissal. 11 U.S.C. § 1307(c). In any event, as discussed above, the Plan does not seek to *modify* the 2000 Order; it seeks to *cure* arrearages. Therefore, confirmation of Mrs. Litton's Plan will not place Wachovia in any worse position than it was in under the 2000 Order.

cluded from availing herself of the protections afforded to Chapter 13 debtors by the Bankruptcy Code.

## IV.

Pursuant to the foregoing, we conclude that the bankruptcy court erred in dismissing the 2000 Petition. Accordingly, we vacate the district court's dismissal and direct that it remand Mrs. Litton's petition to the bankruptcy court for further proceedings.

*VACATED AND REMANDED WITH DIRECTIONS*

SHEDD, Circuit Judge, dissenting:

Anna Litton's proposed Chapter 13 plan was a modification of Wachovia's rights, not a simple cure of a default. For this reason, the bankruptcy court was well within its authority to find that Mrs. Litton had violated the terms of the court's settlement order and to dismiss her Chapter 13 petition. The bankruptcy court (and the district court) properly recognized the crucial fact in this case, that Wachovia's mortgage had already matured *before* Mrs. Litton missed the payment called for by the settlement order. Thus, Mrs. Litton's proposed plan required Wachovia to extend the term of its already matured mortgage. This was a modification of Wachovia's rights, and it was not permissible under the Bankruptcy Code. I respectfully dissent.

## I.

Wachovia's mortgage on Mrs. Litton's property matured (at the latest) on January 31, 2000. In March 2000, Wachovia entered into a settlement with Mrs. Litton to dispose of her first Chapter 13 case. According to the settlement, the Littons would make payments of $10,000 and $55,000 to Wachovia. If the Littons made these payments by June 30, 2000, then — and only then — Wachovia would restructure the mortgage, re-amortizing the remaining balance using a 15-year term and the residential mortgage interest rate afforded by Wachovia on June 30, 2000. Under this new arrangement, the Littons would make annual payments of at least $10,000, with the entire obligation to mature by balloon payment on March 3, 2005, or one year

after construction of improvements to Exit 17 on Interstate 81, which-ever first occurred. The settlement further provided that if the Littons failed to make the scheduled payments by June 30, 2000, then Wachovia would be entitled to foreclose the property according to the underlying mortgage instruments. In other words, the parties agreed that Mrs. Litton's payment of $10,000 and $55,000 by June 30, 2000 was a *condition precedent* to further financing by Wachovia on new terms. At the parties' invitation, the bankruptcy court entered an Agreed Order memorializing the settlement.

Wachovia initiated foreclosure proceedings when Mrs. Litton failed to make the scheduled payment of $55,000 by June 30, 2000. Shortly before the foreclosure, Mrs. Litton filed the instant Chapter 13 petition and proposed a plan whereby she would "catch up in arrearages in payments to Wachovia Bank ($55,000) . . . within 30 days, and . . . make regular payments as called for by agreement."

The bankruptcy court dismissed Mrs. Litton's petition, ruling that her proposed plan violated the terms of the Agreed Order because that plan proposed to "make a new agreement between the parties directly contrary to the provisions of their original agreement." It was impor-tant to the bankruptcy court — as it should be to this Court — that "[p]rior to the making of such agreement the full balance owing on the note secured by the deed of trust was already due and payable."

## II.

The majority correctly recognizes that the outcome of this appeal turns on the characterization of Mrs. Litton's proposed Chapter 13 plan as a modification or a cure.[1] Modification and cure are distinct

---

[1] I note, however, my disagreement with the majority's analysis of this issue as a matter of contract interpretation. The bankruptcy court did not dismiss Mrs. Litton's Chapter 13 petition for failure to comply with a contractual obligation; rather, the dismissal was premised on Mrs. Lit-ton's violation of the bankruptcy court's *order* memorializing a settle-ment. The bankruptcy court was authorized to interpret its own order, subject to the rule that its interpretation must be consistent with the Bankruptcy Code. *See* 11 U.S.C. § 105(a) (authorizing a bankruptcy court to "issue any order, process, or judgment necessary or appropriate

concepts in the Bankruptcy Code. *Landmark Fin. Servs. v. Hall*, 918 F.2d 1150, 1154 (4th Cir. 1990); *Matter of Clark*, 738 F.2d 869, 871-72 (7th Cir. 1984); *In re Taddeo*, 685 F.2d 24, 27 (2d Cir. 1982).

11 U.S.C. § 1322(b)(2) provides that a chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured by a security interest in real property that is the debtor's principal residence." This provision "allows modification of the rights of both secured and unsecured creditors, subject to special protection for creditors whose claims are secured only by a lien on the debtor's home." *Nobleman v. American Sav. Bank*, 508 U.S. 324, 327 (1993). By virtue of its mortgage contract with Mrs. Litton, Wachovia is "indisputably the holder of a claim secured by a lien on [Mrs. Litton's] home." *Id.* at 328. Wachovia's rights as mortgagee are those that are "reflected in the relevant mortgage instruments" and were "bargained for by the mortgagor and the mortgagee." *Id.* at 329-30. Under the deed of trust at issue in this case, Wachovia retained the right to foreclose Mrs. Litton's property once the mortgage matured. Under § 1322(b)(2), Mrs. Litton could not "modify" Wachovia's right to foreclose upon maturity of the debt.

The Bankruptcy Code does not define the term "modify." Other courts have held that a plan impermissibly modifies a mortgagee's rights where (1) it seeks to delay payment of an unaccelerated debt that has naturally matured prior to the filing of the case, *see Matter of Cooper*, 98 B.R. 294, 298-99 (Bankr. W.D. Mich. 1989); (2) it seeks to bifurcate treatment of the amount due under a mortgage into secured and unsecured claims, *see In re Schum*, 112 B.R. 159, 162 (Bankr. N.D. Tex. 1990); or (3) it seeks to convert a demand loan obligation with a variable interest rate into a term loan with a fixed interest rate, *see In re Coffey*, 52 B.R. 54, 55 (Bankr. D.N.H. 1985). Indeed, the majority is quite correct that an attempt to "alter funda-

to carry out the provisions" of the Bankruptcy Code). Thus, it is necessary to determine whether Mrs. Litton's proposed plan amounted to a modification or a cure in order to determine whether the bankruptcy court's interpretation of its own order comports with the substantive provisions of the Bankruptcy Code, not to divine the meaning of an ambiguous contract term.

mental aspects of the debtor's obligations" is a modification forbidden by § 1322(b)(2).

Cure under § 1322(b)(5) is different. While a modification impermissibly alters the debtor's obligations with respect to a mortgage — depriving the mortgagee of its original bargain — a cure simply reinstates the existing mortgage agreement as if the debtor had never defaulted. *Landmark Fin. Servs.*, 918 F.2d at 1154; *Matter of Metz*, 820 F.2d 1495, 1497 (9th Cir. 1987) (stating that a cure "simply reinstates the original debt after correcting the arrearages"). This Court has noted that "[c]ure by its very nature assumes a regime where debtors reinstate defaulted debt contracts in accordance with the conditions of their contracts." *Landmark Fin. Servs.*, 918 F.2d at 1154 (internal quotations omitted). In other words, "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions." *In re Taddeo*, 685 F.2d at 26-27. *Accord In re Hurt*, 158 B.R. 154, 159-60 (9th Cir. BAP 1993) (stating that a cure restores the debtor's mortgage "to its original state before the default regardless of what action the mortgagee has taken"); *Matter of Clark*, 738 F.2d at 872 ("[A]s the term relates to defaults, 'cure' means to restore matters to the *status quo ante*.").

### III.

Mrs. Litton's proposed plan was not a cure because it would not merely restore the *status quo ante*; to the contrary, it would re-write the most basic terms of the mortgage. Under the *status quo ante*, Wachovia held a matured mortgage. Although Wachovia offered Mrs. Litton an opportunity to obtain further financing and avoid foreclosure, such financing was available only if Mrs. Litton made the $55,000 payment by June 30, 2000. Thus, on the date of the default — June 30, 2000 — Wachovia was entitled to foreclose unless Mrs. Litton satisfied the condition precedent of payment.

Rather than restoring the *status quo ante*, Mrs. Litton's proposed plan would create a new mortgage altogether. Under her plan, Mrs. Litton would make a payment of $55,000 (the payment she had missed) to Wachovia; in return, Wachovia would continue to finance her property on the new terms outlined in the settlement agreement. Presumably, Mrs. Litton would be entitled to re-amortization of the

balance of her debt using a 15-year term and the residential mortgage rates prevailing on June 30, 2000. She would be entitled to a payment schedule calling for annual payments of $10,000 with the entire obligation to mature in March 2005. These are new terms — more favorable to Mrs. Litton — for which Wachovia received no consideration at all. In short, Mrs. Litton's plan would require Wachovia to continue financing the purchase of her home under terms other than the terms of the mortgage instrument in effect before her default.[2]

Contrary to the majority's assertions, Mrs. Litton's proposed Chapter 13 plan *did* propose an extension of the final maturity date of the Littons' debt to Wachovia, from January 2000 to March 2005. And confirmation of Mrs. Litton's plan *will* place Wachovia in a worse position than it was in under the 2000 agreement: Wachovia will lose entirely the benefit of holding a matured mortgage, and it will be forced to undertake additional financing obligations on terms more favorable to Mrs. Litton. This plan simply is not a cure.

Even if the majority were correct that Mrs. Litton's proposed plan amounts to a cure, the relevant cure provision cannot save Mrs. Litton in this case. Section 1322(b)(5) permits cure only with respect to "any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." Thus, "if a large final balloon payment is due on a debt prior to the termination of the plan, section 1322(b)(5) may not be utilized." 8 *Collier on Bankruptcy* § 1322.09[2], at 1322-30 (15th ed. rev. 2003). The final balloon payment on Wachovia's mortgage was due on January 30,

---

[2]The majority must presume that the new terms described in the settlement will govern the mortgage if Mrs. Litton makes the payments called for in her proposed plan. Counsel for Mrs. Litton did not even accept that proposition, representing at oral argument that Mrs. Litton would insist upon some — but not all — of the terms contained in the settlement. For instance, counsel stated that Mrs. Litton would not take the benefit of the new rate or the 15-year re-amortization term, but that she would be bound to make payments of at least $10,000 each year. Counsel's careful refusal to say that the mortgage would be governed by precisely the same terms that governed the mortgage prior to the default undermines the contention that this proposed plan is merely a cure that restores the *status quo ante*.

2000 — nine months *before* Mrs. Litton even proposed her plan. Accordingly, Mrs. Litton cannot rely upon § 1322(b)(5) to authorize any cure in this case.[3]

IV.

The bankruptcy court was exactly right: "Wachovia's agreement to restructure and extend significantly the payment terms to the benefit of the Littons was *contingent* upon their making a $55,000 payment by June 30. When the Littons failed to do so, Wachovia was relieved of any obligation to continue to hold open these favorable terms until the Littons could manage to take advantage of them." (Emphasis added.) Mrs. Litton's proposed plan attempts just the kind of modification that the Bankruptcy Code forbids and that Mrs. Litton herself agreed not to make. The bankruptcy court was well within its discretion to interpret its own order, in accordance with the Bankruptcy Code, to dismiss Mrs. Litton's latest Chapter 13 petition. I would affirm that judgment.

---

[3]The majority opinion concludes that § 1322(b)(5) applies in this case because the Agreed Order contemplated maturity of the mortgage obligation in 2005. The majority opinion misreads the Agreed Order. The Agreed Order, memorializing the settlement reached by the parties, stated that Wachovia would continue financing on new terms described in the order "[i]n the event" that Mrs. Litton made the scheduled payments on or before June 30, 2000. And "[i]n the event" that Mrs. Litton failed to make this payment, Wachovia would "be entitled to proceed to enforce its non-bankruptcy law rights and remedies with respect to its collateral pursuant to" the existing mortgage instruments, which provided for a January 2000 maturity date. It is clear from these plain terms that Wachovia still held its matured mortgage and that the effect of the order was merely to offer Mrs. Litton a last chance to pay to obtain future financing. When she failed to make payment by June 30, 2000, there was no new financing arrangement in place and Wachovia was entitled to "proceed to enforce its non-bankruptcy rights and remedies" just as the Agreed Order provided.