**In re J.A. JONES, INCORPORATED, Debtor.**

**Zurich American Insurance Company, Creditor–Appellant,**

v.

**Laura Tessler, Administrator for the Estate of Laura Dunnagan, Creditor–Appellee.**

**No. 06–1834.**

United States Court of Appeals, Fourth Circuit.

Argued: March 13, 2007.

Decided: June 26, 2007.

---

**ARGUED:** Albert G. Bixler, Eckert, Seamans, Cherin & Mellott, L.L.C., Philadelphia, Pennsylvania, for Appellant. J. Dennis Bailey, Carruthers & Bailey, P.A., Winston–Salem, North Carolina, for Appellee. **ON BRIEF:** Karen Lee Turner, Eckert, Seamans, Cherin & Mellott, L.L.C., Philadelphia, Pennsylvania; A. Cotten Wright, Grier, Furr & Crisp, P.A., Charlotte, North Carolina, for Appellant. Joseph T. Carruthers, Carruthers & Bailey, P.A., Winston–Salem, North Carolina, for Appellee.

Before WILKINSON and KING, Circuit Judges, and T.S. ELLIS, III, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Senior Judge ELLIS wrote the opinion, in which Judge KING joined. Judge WILKINSON wrote a concurring opinion.

## OPINION

ELLIS, Senior District Judge.

This bankruptcy appeal presents the question whether a wrongful death claim- ant who had not yet filed suit, but whose identity as a potential claimant was known to the debtor, was a "known creditor" of the debtor, and thus entitled to specific notice of the bankruptcy proceeding and applicable filing dates. Both the bank- ruptcy court and district court answered this question in the affirmative. We affirm because the claimant's identity and poten- tial claim were either actually known or reasonably ascertainable to the debtor.

### I.

The pertinent facts, which were found by the bankruptcy court, are fully sup- ported by the record and essentially undis- puted by the parties. Appellee, Laura Tessler, is the administrator of the estate of her deceased daughter, Laura Elizabeth Dunnagan (the "Dunnagan Estate"). Dun- nagan died on January 22, 2003, as a result of injuries sustained in an automobile acci- dent that occurred on November 1, 2002, in a construction zone on Interstate High- way 77 in Charlotte, North Carolina, where Rea Construction Company ("Rea")—one of the debtors in this case— served as the general contractor (the "Dunnagan Accident").

The Dunnagan Accident involved nine vehicles, some of which were engulfed in flames, including the vehicle driven by Dunnagan. One of the three occupants in Dunnagan's vehicle—Stephen Coffey—was evacuated from the scene by helicopter and transported to the University of North Carolina ("UNC") Hospital in Chapel Hill, where he died that evening as a result of the serious injuries and burns suffered in the Dunnagan Accident. Dunnagan like- wise suffered extensive burns over 60% of her body and was transported to the burn unit at UNC Hospital. After spending 83 days undergoing treatment in the burn unit, Dunnagan, too, ultimately succumbed

to her serious injuries and died on January 22, 2003.

Rea, the general contractor for the $77 million I–77 construction project, was aware of the Dunnagan Accident shortly after it occurred. Specifically, Kipp Cheek, the Rea project manager assigned to the construction project, was out of town on November 1, 2002, but was called by another Rea employee who informed him of the Dunnagan Accident on the day it occurred. Steven Hubbard, the Safety and Loss Control Manager for Rea, was also promptly notified of the Dunnagan Accident and traveled with another member of the Rea Safety Department to the accident site on the evening of November 1, 2002, after the scene had been cleared by law enforcement.

Shortly after the Dunnagan Accident, Rea reported the incident to its liability insurer, Zurich American Insurance Company ("Zurich")—the appellant in this case—in accordance with a policy provision requiring Rea as the insured to report to Zurich "an 'occurrence' or an offense which may result in a claim." Joint Appendix ("J.A.") at 584. Rea also provided notice to Zurich of four or five additional vehicle accidents that had occurred in the I–77 construction zone in the week preceding the Dunnagan Accident. Zurich promptly assigned each of the reported accidents a claim number and referred the matters to its Major Claims Unit. Tamara Woolard, the Zurich claims representative assigned to handle the Rea accident file, hired multiple accident reconstruction experts to investigate the various vehicle accidents that had occurred in the I–77 construction zone, including the Dunnagan Accident. Woolard also retained legal counsel to represent Zurich in these mat-

ters and to create a legal privilege to shield the investigation and its results from discovery in the event of any future litigation arising out of any of the reported I–77 accidents.

Cheek, the Rea project manager, was personally involved on behalf of Rea in investigating the reported I–77 accidents, including the Dunnagan Accident, and in assisting the investigation conducted by Zurich's counsel. To this end, Cheek and others in his office and in the Rea Claims Department obtained copies of various documents relevant to the I–77 accidents, including, in particular, the Dunnagan Accident. Among the documents Rea assembled were accident reports prepared by the State Highway Patrol disclosing Dunnagan's name, address and date of birth; newspaper articles regarding the I–77 accidents; press releases regarding the I–77 construction project; photographs; roadway diagrams; project diaries; project supervisor diaries; and other documents concerning Rea's potential liability for the I–77 construction zone accidents, including specifically the Dunnagan Accident. Cheek also prepared a timeline of critical events pertaining to the I–77 accidents. A copy of this timeline, together with approximately 250 pages of assembled relevant documents, was sent by Cheek to the Rea Claims Department, as well as to Zurich.

There was also extensive coverage of the I–77 construction zone accidents in a local newspaper, *The Charlotte Observer,* including several articles containing quotes from Cheek regarding the I–77 construction project as well as a description of certain remedial measures taken by Rea to reduce the risk of future vehicle accidents in the construction zone.[1] Cheek was familiar

---

**1.** The original posted speed limit for the roads in the I–77 construction zone was 65 miles per hour. Rea had apparently recommended

a reduction in this speed limit to the North Carolina Department of Transportation (DOT). Although the speed limit had not

with, and read these articles because he served as Rea's designated media contact person with respect to the I–77 construction project and Rea sought to stay abreast of any stories or news reports concerning the ongoing project. One newspaper article, in particular, contained a photograph of Dunnagan and reported the details of the Dunnagan Accident, as well Dunnagan's death on January 22, 2003. Cheek cut this article out of the newspaper and kept it in his office in a location where it could readily be observed as a continuing reminder of the importance of safety in Rea's work.

Cheek knew there was a possibility that Rea could be sued as a result of the I–77 construction zone accidents, including the Dunnagan Accident. Although he personally believed that the construction zone was safe for the driving public and that Rea had done nothing wrong with respect to the I–77 accidents, he nonetheless understood that Rea could still be sued. Indeed, Cheek testified that he "anticipated" a lawsuit in this instance, particularly given that two fatalities were involved. J.A. at 585. Cheek therefore discussed the possibility of litigation arising out of the I–77 construction zone accidents with members of the Rea Claims Department.

Hubbard—Rea's Safety and Loss Control Manager—also did not personally believe that Rea was responsible for any of the accidents in the I–77 construction zone, including the Dunnagan Accident. Yet, he, too, was aware of the possibility that Rea might be sued as a result of the I–77 accidents. He also acknowledged that the likelihood of a lawsuit was greater where one or more deaths resulted, as occurred in the Dunnagan Accident.

Like Cheek and Hubbard, Woolard—the Zurich claims representative—did not believe that Rea would ultimately be held liable for any of the I–77 construction zone accidents, including the Dunnagan Accident. She based this conclusion on the internal investigation conducted by Zurich and its retained counsel and accident reconstruction experts. Woolard nonetheless kept the claim files pertaining to this series of accidents open until March 31, 2004. She did so, she said, because she expected activity on these files, such as a letter of representation advising Zurich of a claim against Rea. J.A. at 586.

Approximately one year after the Dunnagan Accident, between September 25 and November 12, 2003, J.A. Jones, Inc. and its various subsidiaries, including Rea, filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.[2] The bankruptcy court fixed February 2, 2004, as the last day for creditors to file any pre-petition claims they sought to assert against the debtors' estate (the "Bar Date"). Notice of the bankruptcy filing and the claims Bar Date was served on certain known creditors of the debtors,

been reduced as of the date of the Dunnagan Accident, the DOT eventually reduced the speed limit to 55 miles per hour in the days following the Dunnagan Accident.

**2.** At the time the bankruptcy petitions were filed, Cheek was still employed by Rea. Cheek was subsequently employed by Rea Contracting, a separate entity that later acquired Rea by purchasing all of its assets. When Cheek left Rea and commenced employment with Rea Contracting, he took with him a copy of his file pertaining to the I–77 construction zone accidents. And, when Cheek ultimately left Rea Contracting in April 2004, he again took a copy of the accident file with him, and left a copy at Rea Contracting. In this regard, Cheek testified that he kept a copy of the file for himself in case he needed any of the information in the event Rea was later sued. The I–77 construction zone accident file was the only file Cheek copied and took with him when he left his employment with Rea Contracting.

but not on the Dunnagan Estate. For the benefit of unknown creditors of the debtors, notice of the bankruptcy filing and the claims Bar Date was also published in one national and one local newspaper, specifically *The Wall Street Journal* and *The Charlotte Observer.*

On June 28, 2004, the bankruptcy court approved the debtors' Second Amended and Restated Joint Chapter 11 Plan of Liquidation (the "Plan"). Notice of the Plan confirmation hearing, scheduled for August 18, 2004, as well as the deadline for filing any objections to confirmation of the proposed liquidation Plan, was again mailed to certain known creditors of the debtors, but not to the Dunnagan Estate. And again, notice of the scheduled confirmation hearing and objections filing deadline was also published in *The Wall Street Journal* and *The Charlotte Observer* for the benefit of unknown creditors of the debtors. Eventually, on August 19, 2004, the day after the scheduled confirmation hearing, the bankruptcy court confirmed the debtors' liquidation Plan, specifically the debtors' Third Amended and Restated Joint Chapter 11 Plan of Liquidation.

Neither appellee Tessler nor counsel for the Dunnagan Estate saw the notices published in *The Wall Street Journal* and *The Charlotte Observer* pertaining to the debtors' bankruptcy proceedings at the time of publication. Nor did they have actual knowledge of the debtors' bankruptcy case or applicable filing deadlines until late October 2004, well after expiration of the Bar Date for filing pre-petition claims against the debtors and confirmation of the debtors' liquidation Plan. Thus, on December 9, 2004, Tessler, as administrator for the Dunnagan Estate, filed a motion in the bankruptcy court seeking an extension of the Bar Date to allow for the late filing of

a pre-petition claim against Rea, as well as an order declaring that she was not bound by the terms of the confirmed liquidation Plan, on the ground that the Dunnagan Estate was a known creditor of Rea that did not receive actual notice of the debtors' bankruptcy proceedings and applicable filing and hearing dates. On December 29, 2004, Zurich opposed Tessler's motion and a series of hearings on the motion then ensued. In the course of the initial hearing on January 5, 2005, the bankruptcy court, with Zurich's consent, granted Tessler relief from the automatic stay for the limited purpose of allowing Tessler to initiate a wrongful death action against Rea in state court prior to expiration of the applicable North Carolina statute of limitations.[3] J.A. at 276. Additional hearings on Tessler's motion for an extension of the Bar Date were held on February 24 and October 25, 2005, and final arguments were heard on November 9, 2005. Thereafter, on December 20, 2005, the bankruptcy court issued a final order granting Tessler's motion. J.A. at 583–88. Specifically, the bankruptcy court's December 20, 2005 Order (i) authorized the late filing of a pre-petition claim by Tessler against Rea on the ground that the Dunnagan Estate was a known creditor of Rea who did not receive actual notice of the filing of the debtors' bankruptcy petition, the Bar Date, the confirmation hearing date or the deadline for filing objections to confirmation of the liquidation Plan, and thus was not bound by the terms of the confirmed liquidation Plan, (ii) granted additional relief from the automatic stay to allow the Dunnagan Estate to pursue the previously-filed wrongful death action against Rea in state court, and (iii) declined to consider Zurich's potential financial obligations under the terms of its liability policies with

---

3. The statute of limitations applicable to wrongful death actions filed in North Carolina is two years. *See* N.C. Gen.Stat. Ann. § 1–53(4) (2007).

Rea with respect to the pending state wrongful death action. Zurich promptly appealed the December 20, 2005 Order to the district court, which subsequently affirmed on June 20, 2006. J.A. at 728–733. The instant appeal by Zurich followed.

## II.

■■■ We review "the judgment of a district court sitting in review of a bankruptcy court *de novo,* applying the same standards of review that were applied in the district court." *In re Litton,* 330 F.3d 636, 642 (4th Cir.2003) (citing *In re Biondo,* 180 F.3d 126, 130 (4th Cir.1999)). Thus, the bankruptcy court's findings of fact are reviewed for clear error, and conclusions of law are reviewed *de novo. See* Rule 8013, Fed. R. Bankr.P.; *In re Kielisch,* 258 F.3d 315, 319 (4th Cir.2001). Mixed questions of law and fact are also reviewed *de novo. See In re Litton,* 330 F.3d at 642 (citation omitted).

## III.

■■■ Under the Bankruptcy Code, a debtor is generally discharged from any debt that arose prior to the bankruptcy court's confirmation of the debtor's proposed liquidation or reorganization plan. *See* 11 U.S.C. § 1141(d). Yet, before a pre-petition or pre-confirmation claim can be discharged under the applicable provisions of the Bankruptcy Code, a debtor's creditors must be afforded notice of the debtor's bankruptcy case, as well as the deadline for asserting any pre-petition claims against the debtor, so as to provide the creditors an adequate opportunity to

assert any claims they may have against the debtor's estate. *See Chemetron Corp. v. Jones,* 72 F.3d 341, 346 (3d Cir.1995). The Supreme Court made clear in *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) that

> [a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Id.* at 314, 70 S.Ct. 652 (citations omitted). In other words, a claim asserted by a creditor against a debtor's estate cannot constitutionally be discharged in accordance with the Bankruptcy Code unless the debtor provides constitutionally adequate notice to the creditor of the debtor's bankruptcy proceeding, as well as the applicable filing deadlines and hearing dates.[4]

■■■ The type of notice that is reasonable or adequate for purposes of satisfying the due process requirement in this context depends on whether a particular creditor is known or unknown to the debtor. In this regard, to achieve a constitutionally permissible discharge of a known creditor's claim against a debtor, actual notice of the bankruptcy filing and applicable bar date is required.[5] By contrast, where a creditor is unknown to the debtor, constructive notice—typically in the form of publication—is generally sufficient to pass

---

**4.** *See Chemetron,* 72 F.3d at 346 n. 1 (noting that "[a]lthough *Mullane* involved the notice due beneficiaries on judicial settlement of accounts by the trustee of a common trust fund, subsequent courts have interpreted the case to set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases") (citing *In re Pettibone Corp.,* 162

B.R. 791, 806 (Bankr.N.D.Ill.1994); *In re R.H. Macy & Co.,* 161 B.R. 355, 359 (Bankr. S.D.N.Y.1993)).

**5.** *See Chemetron,* 72 F.3d at 346 (citing *City of New York v. N.Y., N.H. & H.R. Co.,* 344 U.S. 293, 296, 73 S.Ct. 299, 97 L.Ed. 333 (1953)).

constitutional muster.[6]

 An unknown creditor, *i.e.*, one who is not entitled to actual notice of the debtor's bankruptcy filing, is a claimant whose identity or claim is wholly conjectural or "whose interests or whereabouts could not with due diligence be ascertained" by the debtor.[7] Known creditors, in contrast, include claimants whose identities are actually known to the debtor, as well as claimants whose identities are "reasonably ascertainable" to the debtor. *Tulsa*, 485 U.S. at 490, 108 S.Ct. 1340; *see also Chemetron*, 72 F.3d at 346. And, in this regard, the Supreme Court has made clear that a creditor is "reasonably ascertainable" if the debtor can uncover the identity of that creditor through "reasonably diligent efforts." *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n. 4, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983). In this regard, reasonable diligence by the debtor in attempting to ascertain the identity of its creditors does not require "impracticable and extended searches ... in the name of due process." *Mullane*, 339 U.S. at 317, 70 S.Ct. 652. Put differently, "what is required is not a vast, open-ended

investigation." *Chemetron*, 72 F.3d at 347. Instead,

> [t]he requisite search ... focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required. Only those claimants who are identifiable through a diligent search are "reasonably ascertainable" and hence "known" creditors.

*Id.*

 It is important to note that there is no bright-line rule to be applied in determining whether a particular creditor is known or unknown to a debtor for constitutional notice purposes. Rather, the known creditor analysis must properly focus on the totality of the circumstances in each case.[8] Indeed, as one bankruptcy court correctly summarized,

> [r]easonable diligence in ferreting out known creditors will, of course, vary in different contexts and may depend on the nature of the property interest held by the debtor. Applying *Mullane's* "reasonable under the circumstances" standard, due process requires a reasonable search for contingent or unmatured claims so that ascertainable creditors

6. Indeed, constructive notice can be satisfied through publication because "in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." *Mullane*, 339 U.S. at 317, 70 S.Ct. 652 (citations omitted); *see also Tulsa Professional Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988) ("For creditors who are not 'reasonably ascertainable,' publication notice can suffice.")

7. *Mullane*, 339 U.S. at 317, 70 S.Ct. 652 (stating that the category of "persons missing or unknown" includes individuals "whose interests or whereabouts could not with due diligence be ascertained" and noting that it is reasonable to dispense with actual notice to

claimants "whose interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to [the] knowledge [of the debtor]"); *Tulsa*, 485 U.S. at 490, 108 S.Ct. 1340 (stating that "[n]or is everyone who may conceivably have a claim properly considered a creditor entitled to actual notice ... [as][i]t is reasonable to dispense with actual notice to those with mere 'conjectural' claims").

8. While the bankruptcy court's known creditor analysis is reviewed *de novo*, it is nonetheless appropriate to give substantial consideration to the bankruptcy court's conclusions in this regard given that court's significant experience and expertise in these matters, which routinely arise in the administration of bankruptcy estates.

can receive adequate notice of the bar date. What is reasonable depends on the particular facts of each case. A debtor need not be omnipotent or clairvoyant. A debtor is obligated, however, to undertake more than a cursory review of its records and files to ascertain its known creditors.

*In re Drexel Burnham Lambert Group Inc.,* 151 B.R. 674, 681 (Bankr.S.D.N.Y. 1993). Thus, stated succinctly, a known creditor or claim arises from facts that would alert a reasonable debtor, based on a careful examination of its own books and records, to the possibility that a claim might reasonably be filed against it by a particular individual or entity.[9]

■ These principles, applied here, compel the conclusion that the bankruptcy court, and thereafter the district court, correctly determined that the Dunnagan Estate was a known creditor of Rea at the time of the bankruptcy filing. Indeed, a *de novo* review of the detailed findings of fact made by the bankruptcy court—all of which are fully supported by the record, and thus not clearly erroneous—confirms that Rea either actually knew or with "reasonably diligent efforts" could have ascertained the identity of the Dunnagan Estate as a creditor. *See Mennonite,* 462 U.S. at 798 n. 4, 103 S.Ct. 2706. The Dunnagan Estate was therefore entitled to actual notice of the debtors' bankruptcy filing, as well as the applicable filing and hearing dates. It follows that, because the Dunnagan Estate was not provided actual notice, the bankruptcy court was correct in allowing Tessler to assert a pre-petition claim against Rea on behalf of the Dunnagan Estate beyond expiration of the originally-scheduled Bar Date and confirmation of the debtors' liquidation Plan.

A plethora of facts and circumstances confirm this conclusion. To begin with, the Dunnagan Accident, which was extensive and tragic, resulting in numerous injuries to the occupants of nine separate vehicles and the untimely deaths of two young individuals, including Dunnagan, was understandably well-publicized in local newspapers. Cheek was not only familiar with these newspapers articles, he personally contributed to the articles. Cheek also discussed details of the Dunnagan Accident with individuals from the Rea Claims Department. Especially telling is that Rea reported the Dunnagan Accident to its liability insurer, Zurich, as "an 'occurrence' or an offense which may result in a claim." J.A. at 584.

Also telling was Zurich's response to this notice, a response fully known to Rea. Thus, Rea knew that after receiving notice of the Dunnagan Accident, Zurich opened a claims file on the Dunnagan Accident and assigned it to a claims representative, who, in turn, retained multiple accident reconstruction experts to investigate the I–77 accidents, including the Dunnagan Accident, and also retained legal counsel to protect the results of this investigation from discovery in the event of any future litigation. In the circumstances, it is hardly surprising that Cheek (Rea) and Woolard (Zurich) testified that they expected a lawsuit and Hubbard (Rea) likewise acknowledged that the possibility of a lawsuit from an accident was greater where, as here, one or more deaths resulted.

In the weeks following the Dunnagan Accident, Cheek prepared a timeline of critical events and assembled more than

---

**9.** *See In re Crystal Oil Co.,* 158 F.3d 291, 297 (5th Cir.1998) (holding that "in order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable").

250 pages of relevant documents pertaining to the I–77 construction zone accidents. Among the documents was a State Highway Patrol accident report specifically disclosing Dunnagan's name, address and date of birth. Sensitive to the potential for a claim against Rea, Cheek sent a complete copy of these documents to the Rea Claims Department, as well as to Zurich. He left a copy of the entire I–77 construction zone accident file with Rea when he ultimately left Rea's employment, but also retained a separate copy of the file in the event of future litigation.

In sum, the record facts point convincingly to the conclusion that Rea was in possession of more than ample information and documents identifying the Dunnagan Estate as a known creditor of Rea under the Bankruptcy Code. "[R]easonably diligent efforts" by responsible Rea personnel would certainly have disclosed this. *Tulsa*, 485 U.S. at 490, 108 S.Ct. 1340; *Mennonite*, 462 U.S. at 798 n. 4, 103 S.Ct. 2706. It follows that the Dunnagan Estate, as a known creditor, was entitled to specific notice of Rea's bankruptcy filing, as well as the applicable hearing and filing dates.

■■■ Zurich essentially advances three arguments to avoid this conclusion, none of which is persuasive. First, Zurich contends that based on its investigation, Rea and Zurich dispute whether Rea would ultimately be liable to the Dunnagan Estate. This is irrelevant to the known creditor analysis because a disputed claim is nonetheless sufficient to meet the definition of "claim" under Section 101(5) of the Bankruptcy Code.[10] Thus, a disputed claim,

if known, must be listed as a known claim in the appropriate schedule accompanying a debtor's initial petition for bankruptcy relief.[11]

■■■ Second, Zurich points to the fact that the Dunnagan Estate, either through Tessler or through counsel, had not yet communicated with Rea or filed a claim against Rea at the time of the debtors' bankruptcy filing. Yet, this fact alone does not alter the conclusion reached here. To be sure, while the lack of prior notice from a creditor might be a relevant factor in the totality of the circumstances analysis in some cases, it is here overwhelmed by compelling evidence showing that Rea had actual knowledge of the identity of the Dunnagan Estate as a creditor, or certainly with "reasonably diligent efforts" could have ascertained this fact from a review of its own records. *Tulsa*, 485 U.S. at 490, 108 S.Ct. 1340; *Mennonite*, 462 U.S. at 798 n. 4, 103 S.Ct. 2706. And, while a creditor's notice of a claim would certainly aid a debtor in identifying a known creditor, settled and sensible authority provides that such notice is not necessary and that the debtor must make its own determination based on a reasonably diligent effort in reviewing its own records. *See Mennonite*, 462 U.S. at 798 n. 4, 103 S.Ct. 2706.

Finally, Zurich mistakenly argues that the bankruptcy and district courts, in concluding that the Dunnagan Estate was a known creditor of Rea, improperly "confuse[d] a debtor's *awareness* of an accident with knowledge that such an accident would present a claim in the bankruptcy

---

**10.** Under Section 101 of the Bankruptcy Code, the term "claim" is defined broadly to include, *inter alia*, "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, *disputed*, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(5)(a) (emphasis added).

**11.** Bankruptcy debtors are required to prepare and submit a list or schedule of creditors with an initial bankruptcy petition so that appropriate notice can be provided to those creditors. 11 U.S.C. § 521.

case." Appellant's Br. at 15–16 (emphasis in original). Contrary to Zurich's argument, it is pellucidly clear that the bankruptcy and district courts' determination that the Dunnagan Estate was a known creditor of Rea rested on far more than the mere awareness of the vehicle accident resulting in Dunnagan's death. Rather, both courts relied on a compelling set of circumstances pointing persuasively to the conclusion that the Dunnagan Estate would likely file a claim against Rea as a result of the Dunnagan Accident. Nor does this conclusion impose an unreasonable burden on debtors to identify and provide actual notice to wholly speculative or conjectural creditors under the applicable Bankruptcy Code provisions, as Zurich contends. To the contrary, the result reached here requires no more than that mandated by Supreme Court precedent, namely "reasonably diligent efforts" on the part of the debtor to ascertain the identity of its creditors. *Mennonite*, 462 U.S. at 798 n. 4, 103 S.Ct. 2706; *Chemetron*, 72 F.3d at 347.

For the foregoing reasons, we affirm the district court's decision affirming the bankruptcy court's finding that the Dunnagan Estate was a known creditor of Rea at the time of the bankruptcy filing, and thus entitled to specific notice of the bankruptcy petition and appropriate filing and hearing dates.

## IV.

Zurich also contends the bankruptcy court erred in failing to address the effect of the Dunnagan Estate's status as a known creditor on Zurich's financial obligations given the complex settlement agreement reached between Zurich and the debtors in the course of the bankruptcy proceedings. Specifically, this settlement agreement—which was ultimately incorporated in, and made a part of, the confirmed liquidation Plan—resolved numerous disputes concerning amounts owed to Zurich or due from Zurich under the debtors' respective insurance policies, and the manner in which claims covered by the policies were to be handled in the future. J.A. at 56.

■ The short answer to Zurich's argument in this regard is that the Dunnagan Estate—as a known creditor of Rea who was not provided with actual notice of the bankruptcy filing—is not bound by the terms of the confirmed liquidation Plan, including the Zurich settlement agreement incorporated therein.[12] Moreover, the question of whether, and to what extent, Zurich might ultimately be liable to the Dunnagan Estate as a result of the wrongful death action filed against Rea is entirely premature given that Rea's liability has not yet been established. In the circumstances, therefore, the district court was correct in affirming the bankruptcy court's discretionary decision to decline to address Zurich's potential settlement agreement obligations in light of the Dunnagan Estate's status as a known creditor of Rea.

## V.

For the foregoing reasons, the judgment of the district court, affirming the judgment of the bankruptcy court, is affirmed.

*AFFIRMED*

---

12. *See In re CareMatrix Corp.*, 306 B.R. 478, 486 (Bankr.D.Del.2004) (recognizing that "when a creditor does not receive adequate notice, the creditor is not bound by the confirmation order") (citations omitted); *In re Ke-* *wanee Boiler Corp.*, 297 B.R. 720, 730 (Bankr. N.D.Ill.2003) (providing that "[a] creditor's claim cannot be subjected to a confirmed plan that it had no opportunity to dispute").

WILKINSON, Circuit Judge, concurring:

I am pleased to concur with the majority in affirming the district court, and agree with those facts the majority mentions as supporting the need for actual notice in this case. Because other facts in the record could support the conclusion that the Dunnagan estate was not a known creditor, however, I write to emphasize what I regard as the deciding factor in this case: The systemic value in supporting a bankruptcy court's determination in an area where bankruptcy courts have significant expertise, which involves a somewhat ministerial matter, and where the inefficiency of incurring two appeals on close totality of the circumstances questions is apparent.

As the majority notes, the determination of whether a creditor is known or unknown is fact-intensive: there is "no bright-line rule," and the determination hinges upon "the totality of the circumstances" and the "particular facts of each case." Maj. Op. at 250 (internal citation omitted). Moreover, as the majority notes, it is "appropriate to give substantial consideration to the bankruptcy court's conclusions" in determining whether a party is a known creditor "given that court's significant experience and expertise in these matters, which routinely arise in the administration of bankruptcy proceedings." Maj. Op. at 250 n. 8.

I agree that the facts the majority describes support the need for actual notice. *See* Maj. Op. at 251–52. And yet the case is hardly open and shut, given that no litigation was filed against the debtor prior to the claims-bar date; that the estate and its attorneys never mentioned to the debtor that the estate might file suit; that there was no communication between the estate and the debtor of any sort; and that there are few if any cases holding a party to be a known creditor when the creditor had no pre-existing relationship with the debtor through contract, correspondence, or course of dealing. Counsel for the decedent was hired in November of 2002, and counsel or the estate might have been expected to communicate with Rea by the claims-bar date in February of 2004. Moreover, an accident report indicated Rea was not at fault because its construction site was separated from the flow of traffic by barriers.

In other words, the case for general or actual notice can be argued either way. In this sort of circumstance, it makes all the sense in the world to back up a bankruptcy court's determination rather than encourage the laborious process of two lengthy and expensive appeals. I therefore agree that the judgment below should be affirmed.