LIPEZ, Circuit Judge.
 

 This case requires us to evaluate an award of compensatory and punitive damages by the Bankruptcy Court for the District of Massachusetts pursuant to 11 U.S.C. § 105(a) of the Bankruptcy Code, a provision that grants bankruptcy courts the authority to enforce provisions of the Bankruptcy Code, and related court orders, and to prevent an abuse of the bankruptcy process. In an adversary proceeding, the bankruptcy court awarded appellee Jacalyn S. Nosek (“Nosek”) $250,000 in emotional distress damages and $500,000 in punitive damages for appellant Ameriquest Mortgage Company’s (“Ameriquest”) violations of 11 U.S.C. § 1322(b), a provision outlining the permitted elements of a debtor’s Chapter 13 bankruptcy plan, and Nosek’s Chapter 13 plan itself. These alleged violations stem from Ameriquest’s accounting practices related to Nosek’s ongoing mortgage payments to the company and her payment of
 
 *38
 
 pre-petition arrearages, all made pursuant to her Chapter 13 plan. The Massachusetts District Court affirmed the bankruptcy court’s judgment. It also affirmed the bankruptcy court’s confirmation of an amended Chapter 18 plan that reflected the damages award in the adversary proceeding.
 

 Ameriquest appeals these two judgments of the district court. Concluding that there was no violation of either the Bankruptcy Code or Nosek’s plan, we vacate the judgments.
 

 I.
 

 We recite the facts as determined by the bankruptcy court.
 

 A. Background
 

 In 1997, Nosek entered into a $90,000 Adjustable Rate Note (“Note”) with Amer-iquest, intending to use the funds to pay off several outstanding bills and investing a portion of the money in an internet marketing scheme. The Note was secured by a mortgage on her principal residence, located in Massachusetts.
 

 In 2000, Nosek began to miss payments on the Note. In early 2001, an Ameriquest representative contacted Nosek requesting a payment of $6,000, which constituted three payments on the Note as well as late charges.
 
 [1]
 
 Ameriquest went forward with a foreclosure proceeding on Nosek’s home, prompting her to file two bankruptcy petitions pursuant to Chapter 13 of the Bankruptcy Code over the course of the next year. The Bankruptcy Court dismissed both cases on motions by the Chapter 13 trustee because of Nosek’s failure to provide certain information requested by the trustee.
 

 Again facing a foreclosure notice, Nosek filed a third bankruptcy petition in October 2002, Ameriquest filed a Motion for Relief from the Automatic Stay, alleging that No-sek had failed to make post-petition payments from December 1, 2002 through February 1, 2003, and that she had a pre-petition arrearage of $19,789.14. In June 2003, the parties entered into an agreement under which, along with her regular payments on the Note, Nosek was required to send Ameriquest additional funds to be applied to her post-petition arrearage; together, this worked out to approximately $384.89 per month. The agreement also provided that Nosek would make twelve equal monthly payments totaling $1,175.00 to cover legal fees and costs. The stipulation was approved by the bankruptcy court on July 9, 2003, but Nosek did not make all of the required payments.
 

 Around November 2003, . Nosek proposed a Second Amended Plan of Reorganization (the “Plan”). The Plan allowed Nosek to cure her pre-petition arrearage, then estimated to be $18,810.95, in sixty monthly payments of $313.52. In January 2004, the Bankruptcy Court confirmed the Plan. The summary portion of the Plan contained the following language addressing Ameriquest’s secured claim against Nosek:
 

 Ameriquest ... is retaining its lien on [Nosek’s] property.... The debtor shall continue to make regular monthly payments in accordance with the contract with [Ameriquest]. [Ameriquest] will be paid its pre petition arrearage in the sum of $18,810.95 over 60 months at the amount of $313.52 per month.
 

 
 *39
 
 According to the Plan, Nosek was required to pay her pre-petition arrears “through the Plan” and her “first mortgage” payments directly to Ameriquest.
 

 Also in the final months of 2003, Nosek contacted another lender about refinancing her mortgage. To move forward with the refinancing, Nosek had to provide the broker with a pay-off figure and payment history from Ameriquest on the Note. After receiving written authorization from Nosek, Ameriquest faxed to her a payment history dated May 10, 2004 (the “Payment History”) showing payments made between March 10, 2003 and May 4, 2004.
 

 The Payment History contained the total amount that Ameriquest determined was due on the Note, the contractual due date of each payment, the amount Ameri-quest had received, the date on which a payment was recorded, and a column stating that each payment had been placed in an escrow account called a “suspense account.” According to an affidavit provided to the bankruptcy court in connection with the parties’ dispute,
 
 [2]
 
 Ameriquest used the term “suspense account” to refer to “funds credited to a debtor’s account not sufficient to make a full mortgage payment.” As the affidavit explained, these accounts allow Ameriquest to accept partial payments that would otherwise be returned to debtors for noncompliance with contractual obligations. In other words, suspense accounts serve as a type of “collection bucket” to hold funds until they can be apportioned to the oldest outstanding contractual payment. The affidavit went on to state that “‘Suspense Accounts’ are a functionality of loan servicing computer systems used by the lending industry to distinguish partial or over-payments on a loan as they relate to contractual and post-petition due dates.”
 

 The parties disagreed as to whether the Payment History accurately reflected No-sek’s post-petition payments. Nosek claimed that all of her payments were made in full in the amounts provided to her by Ameriquest and that Ameriquest erroneously failed to distinguish between pre- and post-petition payments.
 
 [3]
 
 In response, Ameriquest insisted that Nosek was properly credited for the payments she made. According to an Ameriquest representative deposed in connection with the parties’ litigation, the company maintained two accounting systems, one through a computer program that tracked only the oldest payment owed on the Note, regardless of whether it was a pre-petition or post-petition payment, and a second system done manually by a bankruptcy specialist who accounted only for post-petition due dates. The computer program sought to match up any payment received, regardless of the source, to the oldest contractual obligation due. If the amount received did not meet the amount due on a single payment, the payment was placed in suspense until, in theory, enough money was collected from the debtor to satisfy a payment. With respect to the second system, if a payment satisfied a post-petition amount due, the bankruptcy specialist would consider the payment as current and advance Nosek’s post-payment schedule one payment. Ameriquest’s methods of accounting for Nosek’s payments were not revealed to her, nor were they ex
 
 *40
 
 plained in any of the Note or mortgage documents.
 

 In July 2004, Nosek sought from Amer-iquest an explanation of the accounting discrepancies she perceived in the Payment History. She also filed a “Motion to Determine the Amount of Liens” with the bankruptcy court, arguing that all of the payments under the stipulation agreement had been made in full. In September and October 2004, the court twice ordered Ameriquest to provide a detailed accounting, in writing, of Nosek’s account and a memorandum explaining the legal justification for their use of “suspense” accounts. Ameriquest was sanctioned $500.00 in November 2004 for its failure to file an explanation of its use of the “suspense accounts” within 15 days of the orders. In its order imposing sanctions, the bankruptcy court also instructed the debtor to file an adversary proceeding against Ameriquest “concerning the amount of its liens and Ameriquest’s apparent inability to prove an accurate accounting.”
 

 B. Bankruptcy Court Proceedings
 

 On December 2, 2004, Nosek filed suit against Ameriquest in the bankruptcy court. The complaint contained seven claims: (1) violation of the Truth in Lending Act (“TILA”); (2) violation of the Real Estate Settlement Procedures Act (“RES-PA”); (3) violation of Sections 2 and 9 of the Massachusetts Consumer Protection Act, Chapter 93A of the Massachusetts General Laws (“Chapter 93A”); (4) unjust enrichment; (5) breach of good faith and fair dealing; (6) intentional infliction of emotional distress; and (7) lost income.
 

 In October 2005, the bankruptcy court granted, in part, Nosek’s motion for summary judgment. The court found in favor of Nosek on the RESPA claim and the Chapter 93A claim. The court continued the matter for a trial on damages. No-sek’s motion for summary judgment was denied on the remaining counts.
 

 After the trial concluded, the bankruptcy court dismissed each of the remaining claims except the claim for breach of good faith and fair dealing. The court awarded nominal damages for the previously-established RESPA and Chapter 93A violations in the amounts of $1 and $25 respectively. The court also concluded that Ameriquest had violated its implied covenant of good faith and fair dealing by failing to properly and timely credit Nosek’s pre-petition and post-petition payments pursuant to 11 U.S.C. § 1322(b) and her confirmed Chapter 13 Plan. Based on testimony during the trial from Nosek, her therapist, her psychiatrist, her pastor, and her primary care physician, the court concluded that Nosek had suffered serious emotional distress from her interactions with Ameriquest, and that it was reasonably foreseeable that such distress would have resulted from the company’s conduct.
 

 Specifically, the bankruptcy court credited Nosek’s testimony at trial describing how she felt after first learning that her post-petition payments were being placed into a suspense account. Nosek testified:
 

 I felt like somebody hit me in the stom- • ach and — and, you know, sucker punched me and ... so when I saw it, ... it doesn’t represent my payments post-petition, ... and to get another mortgage, they need to see that I was making the correct payments ... — and this doesn’t show that.
 

 I was devastated. I felt there was no hope, that, you know, unless I agreed to pay something that was outrageous ... I became tremendously depressed and really since then I haven’t been able to get my feet under me until just this fall.
 

 
 *41
 
 The court awarded Nosek $250,000 in damages to compensate for the emotional distress she suffered. The bankruptcy court also determined that Nosek had failed to meet her burden to show any actual monetary damages resulting from Ameriquest’s conduct.
 
 [4]
 

 The bankruptcy court’s finding that Am-eriquest had violated its implied covenant of good faith and fair dealing by acting contrary to the text of 11 U.S.C. § 1322(b) is central to this appeal. Section 1322(b) of the Bankruptcy Code offers a Chapter 13 debtor flexibility in the formulation of her bankruptcy plan by listing various elements that the debtor may include in her plan. The court concluded that Ameri-quest had violated § 1322(b) by failing “to account for and properly distinguish between pre-petition and post-petition payments made by [Nosek], as well as ... [its] inability to promptly credit [Nosek’s] account from the suspense account.” The court highlighted instances where there seemed to be sufficient funds in the account to satisfy at least one of Nosek’s contractual obligations, but the money remained in a suspense account. Further, the court found that the Payment History which had been sent to Nosek failed to reflect all of the payments she had made, giving the impression that she had failed to comply with the Plan obligations. Based on these inadequacies, the bankruptcy court concluded that Ameriquest had violated § 1322(b) of the Bankruptcy Code and Nosek’s Chapter 13 Plan, and that Ameriquest had breached its implied covenant of good faith and fair dealing toward Nosek.
 

 C. The District Court Decision
 

 Ameriquest appealed the bankruptcy court’s judgment to the district court, arguing,
 
 inter alia,
 
 that Nosek’s state law claims were preempted by the Bankruptcy Code. On two of the three counts at issue, the district court agreed. The court found that the Bankruptcy Code completely preempted Nosek’s RESPA claim as well as her claim for breach of the implied covenant of good faith and fair dealing. The court remanded Nosek’s Chapter 93A claim for consideration on the merits.
 
 [5]
 
 In the course of deciding these issues, the court also responded to Ameriquest’s assertions challenging the bankruptcy court’s § 1322(b) finding. The court noted:
 

 The Bankruptcy Court found a violation of 11 U.S.C. Section 1322(b), which regulates the modification of the Plan and provides the cures for any defaults. The Bankruptcy Court then grafted onto the Plan an implied covenant of good faith and fair dealing, a state remedy. This was error.
 

 Section 105 of the Code provides the proper mechanism for the Bankruptcy Court to remedy specific violations of the Code. If the Bankruptcy Court is to assess damages, it must not look to the
 
 *42
 
 state law theory employed in this case, but must do so under the equitable powers granted under the Code.
 

 (internal citations and footnote omitted).
 

 D. Remand to the Bankruptcy Court
 

 In March 2007, following the remand, the bankruptcy court revised its prior damages award. First, the court dismissed Nosek’s Chapter 93A claim, acknowledging that there was neither a RESPA violation to support the claim nor any facts that would support an independent violation of Chapter 93A. The court then ordered Ameriquest to pay damages under § 105(a) of the Bankruptcy Code.
 
 [6]
 
 The court based this award on its prior finding that Ameriquest had violated § 1322(b) of the Code or, alternatively, Nosek’s Chapter 13 Plan, and the district court’s directive to apply § 105(a) rather than any state law remedy. The bankruptcy court asserted, “[t]he District Court affirmed the Court’s Section 1322(b) finding and merely disagreed with the remedy applied to it.” Invoking its “statutory contempt powers” under § 105(a) of the Bankruptcy Code, the court awarded No-sek $250,000 for her emotional distress. The court also assessed $500,000 in punitive damages, noting that “Ameriquest is a national mortgage company, which supports the contention that the amount of punitive damages must be significant enough to garner its attention.... [It] uses the same accounting system in servicing all of its Chapter 13 debtors, which shows how widespread the problem could potentially be.”
 

 Ameriquest again appealed the decision to the district court, raising a litany of challenges to the bankruptcy court’s award under § 105(a). Specifically, Ameriquest contended that the bankruptcy court erred by: (1) exceeding the terms of the mandate set forth in the remand from its first appeal; (2) awarding a judgment under § 105(a) of the Bankruptcy Code without an underlying basis for doing so; and (3) awarding emotional distress and punitive damages to Nosek in contravention of § 105(a). The district court disagreed with these contentions, affirming the award without a written opinion. Ameri-quest appeals that decision.
 

 E. Confirmation of Nosek’s Third Amended Plan
 

 Shortly after the bankruptcy court’s initial ruling, and while Ameriquest’s first appeal to the district court was pending, Nosek submitted a Third Amended Chapter 13 Plan to the bankruptcy court. The $250,000 in damages that Ameriquest owed Nosek as a result of the court order was greater than Nosek’s unpaid balance on the Note; accordingly, the Third Amended Plan proposed no further payments by No-sek to Ameriquest. Instead, it provided that “Court ordered payment by Ameri-quest Mortgage in the amount of $250,000 [would] fund 100% [of] this Chapter 13 Plan.”
 

 Within a week of issuing its decision on remand, the bankruptcy court confirmed this plan over Ameriquest’s objection. The district court affirmed. Ameriquest timely appealed that order, asking us to vacate the confirmation of Nosek’s Third Amended Plan because of the court’s erroneous award of damages to Nosek in the
 
 *43
 
 adversary proceeding. The appeal from the judgment entered in that proceeding and the appeal from the order confirming the Third Amended Plan were consolidated for consideration here.
 

 II.
 

 When reviewing the order of a district court affirming a bankruptcy court’s judgment, we “independently examine! ] the bankruptcy court’s decision, reviewing findings of fact for clear error and conclusions of law de novo.”
 
 In re Northwood Props., LLC,
 
 509 F.3d 15, 21 (1st Cir.2007) (citing
 
 Official, Unsecured Creditors’ Comm. v. Stern (In re SPM Mfg. Corp.),
 
 984 F.2d 1305, 1310-11 (1st Cir.1993)).
 

 On appeal, Ameriquest restates its various assertions of error raised previously to the district court. We focus on the argument that we regard as dispositive-namely, that the bankruptcy court’s reliance on § 105(a) was misplaced because there was no underlying violation of the Bankruptcy Code or a related court order that the court could enforce or remedy.
 
 [7]
 
 Ameri-quest contests the bankruptcy court’s conclusion that it violated § 1322(b) of the Bankruptcy Code or, alternatively, Nosek’s Chapter 13 Plan. According to Ameriquest, § 1322(b) merely lists certain optional elements that
 
 may
 
 be included in a Chapter 13 plan, but does not place specific duties or obligations on the creditor. Additionally, Ameriquest argues that Nosek’s Chapter 13 Plan does not explicitly prescribe how and by when the various payments should be credited to her accounts. As such, Ameriquest contends that there is no basis for finding that it had violated the text of § 1322(b) or the terms of the Plan.
 

 A. Section 105(a) of the Bankruptcy Code
 

 Section 105(a) of the Code provides the bankruptcy court broad authority to “exercise its equitable powers — where ‘necessary* or ‘appropriate’ — to facilitate the implementation of other Bankruptcy Code provisions.”
 
 Bessette v. Avco Fin. Servs., Inc.,
 
 230 F.3d 439, 444 (1st Cir.2000) (quoting
 
 Noonan v. Sec’y of Health & Human Servs. (In re Ludlow Hosp. Soc’y, Inc.),
 
 124 F.3d 22, 27 (1st Cir.1997)). Although not “ ‘a roving commission to do equity,’ ”
 
 see Bessette,
 
 230 F.3d at 444 (quoting
 
 Noonan,
 
 124 F.3d at 27), we have recognized that a court “is well within its authority [under § 105(a)] ... to enforce a specific code provision, such as [11 U.S.C.] § 524,”
 
 see id.
 
 at 444 (citation omitted).
 
 [8]
 
 Because § 105(a) gives courts this power to ensure compliance with its own orders, we have referred to it as conferring “statutory contempt powers” which “inherently
 
 *44
 
 include the ability to sanction a party.”
 
 Id.
 
 at 445. Finally, although § 105(a) “does not itself create a private right of action ... a court may invoke § 105(a) ‘if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code.’ ”
 
 Id.
 
 at 444-45 (quoting
 
 Noonan,
 
 124 F.3d at 28).
 

 Despite its broad language, we have recognized important limitations on a court’s § 105(a) authority. For example, § 105(a) may not be invoked where the result of its application would be inconsistent with any other Code provision or it would alter other substantive rights set forth in the Code.
 
 See Bessette,
 
 230 F.3d at 445;
 
 In re Jamo,
 
 283 F.3d 392, 403 (1st Cir.2002);
 
 see also In re Padilla,
 
 389 B.R. 409, 430 (Bankr.E.D.Pa.2008) (“The essence of the boundary of § 105(a) equity power is that the provision cannot provide the basis for requested relief that would either (1) create a new substantive right or (2) conflict with another provision of the Bankruptcy Code.”). Because of these limitations, § 105(a) has been referred to as a “catch-all” provision, effectively filling gaps in the bankruptcy code in order to “preserv[e] the integrity of the bankruptcy system.”
 
 Cuevas-Segarra v. Contreras,
 
 134 F.3d 458, 459 (1st Cir.1998).
 

 Acknowledging a court’s general authority under § 105(a), Ameriquest contests the bankruptcy court’s conclusion that there was an underlying violation of the Bankruptcy Code or a court order justifying equitable relief. Specifically, Ameri-quest asserts that neither § 1322(b) of the Bankruptcy Code nor the terms of Nosek’s Chapter 13 Plan offered it sufficiently concrete directives, such that its conduct could violate the terms of those provisions. We address Ameriquest’s argument with respect to § 1322(b) first.
 

 B. Section 1322(b) of the Bankruptcy Code
 

 Chapter 13 of the Bankruptcy Code allows individuals with regular income to establish flexible repayment plans to address all or part of their debts. 8
 
 Collier on Bankruptcy
 
 ¶ 1322.01 (15th ed. rev.2008) [hereinafter
 
 “Collier”].
 
 Using funds derived primarily from income, Chapter 13 debtors propose a repayment plan that makes installment payments to creditors over a three- to five-year period. If the debtor can satisfy certain statutory obligations, she may address unsecured and secured debts through the plan,
 
 see id.,
 
 and have an opportunity to save her principal residence from foreclosure,
 
 see
 
 11 U.S.C. § 1322(b)(5).
 

 Section 1322(a) of the Bankruptcy Code sets forth the elements required for a Chapter 13 bankruptcy repayment plan to obtain court approval. 11 U.S.C. § 1322(a);
 
 see Barbosa v. Soloman,
 
 235 F.3d 31, 37 n. 8 (1st Cir.2000). For example, the plan must provide “for the submission of a portion of the debtor’s future earnings and income to the control of a trustee and for supervised payments to creditors over a period not exceeding five years.”
 
 Nobelman v. Am. Sav. Bank,
 
 508 U.S. 324, 327, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993);
 
 see also
 
 11 U.S.C. § 1322(a)(1), (c). Section 1322(b), by contrast, provides plan flexibility for Chapter 13 debtors by listing a number of permissive elements that may be included in any plan. 8
 
 Collier
 
 ¶ 1322.01.
 

 Among those permissive elements, § 1322(b)(2) provides that a plan may “modify the rights of holders of secured claims,
 
 other than a claim secured only by a security interest in real property that is debtor’s principal residence,
 
 or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.” 11 U.S.C. § 1322(b)(2)
 
 *45
 
 (emphasis added);
 
 see also Nobelman,
 
 508 U.S. at 327, 113 S.Ct. 2106. The provision has two components. First, § 1322(b)(2) allows debtors to generally modify the rights of secured claim holders, including the amount of the payments on the claim, the timing of the payments, and the finance charges. 8
 
 Collier
 
 ¶ 1322.06. Second, the provision carves out a specific protection for home mortgage lenders from this more general right by preventing any modifications of those claims secured only by a lien on the debtor’s principal residence.
 
 [9]
 

 Rake v. Wade,
 
 508 U.S. 464, 468-69, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). This anti-modification provision prohibits any “fundamental alteration in a debtor’s obligations, e.g., lowering monthly payments, converting a variable interest rate to a fixed interest rate, or extending the repayment term of a note.”
 
 In re Litton,
 
 330 F.3d 636, 643 (4th Cir.2003).
 

 Notwithstanding the general exception set forth in § 1322(b)(2), which prevents the modification of a lender’s rights secured by a debtor’s primary residence, § 1322(b)(5) explicitly “authorizes debtors to cure any defaults on a long-term debt, such as a mortgage, and to maintain payments on the debt during the life of the plan.”
 
 [10]
 

 Rake,
 
 508 U.S. at 469, 113 S.Ct. 2187 (footnote omitted);
 
 see Nobelman,
 
 508 U.S. at 330, 113 S.Ct. 2106. Although the debtor may not change the material terms of the underlying debt, she may stave off foreclosure on her residence by curing a previous default.
 
 See In re Hoggle,
 
 12 F.3d 1008, 1010 (11th Cir.1994) (analyzing § 1322’s purpose and legislative history). The effect of the provision is to “essentially split each of [the debtor]’s secured claims into two separate claims — the underlying debt and the arrearages.”
 
 Rake,
 
 508 U.S. at 473, 113 S.Ct. 2187. Typically, the pre-petition arrearages payments are made through the plan by the Chapter 13 trustee, while the current amounts due are made directly to the lender.
 
 [11]
 
 8
 
 Collier
 
 ¶ 1322.09. If the debtor is successful in curing the default, the debt is reinstated to its pre-default position, thereby “returning] the debtor and creditor to their respective positions before the default.”
 
 In re Litton,
 
 330 F.3d at 644;
 
 see DiPierro v. Taddeo,
 
 685 F.2d 24, 26-27 (2d Cir.1982);
 
 see also
 
 140 Cong. Rec. H10,770 (daily ed. Oct. 4, 1994) (statement of Rep. Brooks) (“[A] cure pursuant to a plan should operate to put the debtor in the same position as if the default had
 
 *46
 
 never occurred.”)-
 
 [12]
 

 Analyzing § 1322(b) with these background principles in mind, the bankruptcy court found that Ameriquest had violated the Bankruptcy Code by failing to adequately distinguish between Nosek’s pre-petition arrearages and her ordinary post-petition mortgage payments. The court stated:
 

 The system [Ameriquest] was using has design flaws that inevitably lead to a showing that [Nosek is] behind in her payments. It did not distinguish between pre- and post-petition obligations which contradicts with [sic] 11 U.S.C. § 1322(b) which provides for the curing of any default over the course of the plan, a plan which is binding on [Ameri-quest] ....
 

 With this language, the court implied that Ameriquest’s accounting threatened No-sek’s opportunity to cure her pre-petition default pursuant to § 1322(b) and the Plan.
 

 Ameriquest contests the bankruptcy court’s conclusion that the company defied the text of § 1322(b). It argues that the language of § 1322(b) does not impose obligations on any party, let alone a lender. We agree. The plain language of § 1322(b), relied upon by the bankruptcy court to And a violation of the Code, does not impose any specific duties on a lender. It merely lists elements that a Chapter 13 debtor may include in her plan.
 
 See, e.g., In re Hart,
 
 184 B.R. 849, 852 (Bankr.M.D.Fla.1995) (noting that, while the provisions of § 1322(a) are mandatory, “the provisions of § 1322(b) are permissive.”). Accordingly, there is no basis for concluding that Ameriquest violated the text of § 1322(b).
 

 A comparison of the language of § 1322(b)and § 524, which we implicitly recognized in
 
 Bessette
 
 as sufficient to support a § 105(a) award, buttresses our conclusion. Section § 524(c) sets forth explicit conditions that must be satisfied if a reaffirmation agreement is to be deemed binding in connection with an otherwise dischargeable debt.
 
 [13]
 

 See
 
 11 U.S.C.
 
 *47
 
 § 524(c);
 
 Bessette,
 
 230 F.3d at 444. In
 
 Bessette,
 
 those conditions were not met. Accordingly, we asserted that it was not in dispute “that the reaffirmation agreement involved in this case falls short of the § 524 criteria.”
 
 Id.
 
 The violation of the Bankruptcy Code in that instance was clear because the underlying statutory text sets forth specific conditions that must be satisfied in order to make the agreement binding and enforceable.
 
 See id.
 

 Because § 1322(b) merely provides optional elements that a debtor may incorporate into her Chapter 13 plan, the provision has no meaning separate and apart from the choices the debtor makes and incorporates into her Chapter 13 plan. In other words, to determine whether and how Nosek took advantage of the cure opportunity provided by § 1322(b)(5), and whether her exercise of her cure rights was threatened by Ameriquest’s accounting practices, we must look to the terms of Nosek’s Plan itself.
 

 C. Nosek’s Chapter 13 Plan
 

 The bankruptcy court stated that Ameriquest “used its accounting procedures to contravene the terms of a confirmed Chapter 13 plan, a plan that was approved on January 16, 2004 and is binding on [Ameriquest].” The pertinent language of the Plan states that the debtor “shall continue to make regular monthly payments in accordance with the contract with the Mortgagee. The Mortgagee will be paid its pre petition arrearage in the sum of $18,810.95 over 60 months at the amount of $313.52 per month.” Like the text of § 1322(b), this language does not place any specific obligations on Ameri-quest, accounting or otherwise. Although we agree that the statement must be read in light of the purposes of § 1322(b)(5) and Chapter 13 more generally — that a debtor can cure a default by paying off her pre-petition arrearages in a reasonable amount of time — this purpose alone does not change the nature of appellant’s obligations in this case. The Plan language says nothing about how Ameriquest must account for pre- and post-petition payments during the course of the repayment period if payments are short, late, or not made at all. Simply put, the terms of the Plan itself do not provide the specificity required to invoke the enforcement authority of § 105(a).
 

 As the plaintiff alleging a violation of the Bankruptcy Code or a related court order, Nosek had the burden of establishing that her cure rights pursuant to § 1322(b) and the Plan were violated or at risk of being
 
 *48
 
 violated by Ameriquest’s accounting practices. Yet the bankruptcy court concluded that Nosek had not shown any economic harm resulting from Ameriquest’s accounting, whether in the form of late fees, finance charges, or an improper notice of default. In addition, the court also rejected Nosek’s claim that the Payment History she received prevented her from refinancing her loan. Addressing this issue in the context of Nosek’s various state law claims, the bankruptcy court found that any damages based on Nosek’s inability to refinance her loan on more favorable terms “would be mere speculation.” The court found that Nosek “did not provide a basis to award actual damages. No documents were offered as evidence of the proposed refinancing. No testimony was proffered refinancing was even offered; there was no evidence of the terms of a refinancing which [Nosek] could expect to receive.”
 

 Notwithstanding Nosek’s failure to prove actual damages sufficient to sustain a Chapter 93A claim, the bankruptcy court concluded that Ameriquest’s accounting practices violated Nosek’s cure rights pursuant to § 1322(b) and her Chapter 13 Plan, providing a predicate for a damage award under § 105(a). In essence, the court found that Ameriquest’s slowness in crediting Nosek’s payments to the proper account and its failure to distinguish between pre- and post-petition payments constituted violations of the Bankruptcy Code and her Plan. This conclusion was erroneous. Although a debtor need not show proof of economic damages to establish that her cure rights have been violated, she must at least establish that her right to cure the pre-petition default provided by the Chapter 13 plan has been impaired or threatened by the creditor’s actions. Nosek’s subjective fear of such impairment, based on a document prepared by Ameriquest for internal purposes only, and in the absence of any evidence that the company regarded her as in default on the basis of its accounting practices, does not suffice. Indeed, Ameri-quest stated that its internal records showed that Nosek was considered current in her payment history. The Payment History document, provided only to Nosek on her request and admittedly difficult to decipher, did not show to the contrary. Nosek offered no other documentation indicating that her cure rights were at risk.
 
 [14]
 

 Moreover, even if the Payment History could somehow be construed as a threat to her right to cure, the proper response of the bankruptcy court would have been an amendment to the Plan specifying the accounting practices necessary to eliminate that threat.
 
 See In re Watson,
 
 384 B.R. 697, 705 (Bankr.D.Del.2008) (holding that Chapter 13 plans “containing
 
 *49
 
 procedures for timely notice of fees and charges, proper allocation of payments and adjudication by [the bankruptcy court] of disputes over assessed fees, costs and charges under a mortgage may be confirmed -without running afoul of section 1322(b)(2)”);
 
 see also In re Collins,
 
 No. 07-30454, 2007 WL 2116416, at *11 (Bankr.E.D.Tenn. July 19, 2007) (“[L]an-guage in a Chapter 13 plan burdening mortgagees with procedural obligations over the life of the plan does not,
 
 per se,
 
 violate § 1322(b)(2)’s anti-modification provision and is permissible and even desirable.”). Only with such an amendment in place would the Plan support the imposition of remedies pursuant to § 105(a) if Ameriquest failed to comply with its terms. Absent that specificity, the court had no authority to order the award it did.
 

 Finally, as the bankruptcy court acknowledged in its initial opinion, the Chapter 13 Plan that the court found Am-eriquest had violated was confirmed on January 16, 2004. Yet the payment history that Nosek received covered the period from March 10, 2003 through May 4, 2004. Most of the payments included in the Payment History were processed before No-sek’s Plan was confirmed, and therefore were not specifically governed by the terms of the Plan. Certainly Ameriquest could not violate Plan language that was not in effect at the time the payments were made. To the extent those payments were covered by the parties’ earlier stipulation agreement, approved in July 2003, there is no indication that Ameri-quest’s conduct violated that agreement.
 

 III.
 

 Notwithstanding these legal conclusions, we are not unsympathetic to Nosek’s predicament as a debtor seeking to satisfy the terms of her Chapter 13 Plan and stave off foreclosure of her home. Her circumstances are all too common today.
 
 [15]
 
 Given their prevalence, it is troubling that Amer-iquest had not established a more efficient and accurate way of handling the accounting issues revealed by this case at the time of trial. We fully understand the bankruptcy court’s concerns about the practices that it described.
 

 Nevertheless, the bankruptcy court’s legitimate concerns did not justify the remedy that it invoked. Nosek did not demonstrate here that Ameriquest’s accounting practices caused her any economic harm or threatened her right to cure her pre-petition default. Morever, even if such a threat had been demonstrated by those practices, there was no language in No-sek’s Plan, as it was confirmed, or in § 1322(b), that addressed how Ameriquest was to apply the payments it received from Nosek or from the trustee. Under such circumstances, the Plan would have to be amended to prescribe the accounting practices necessary to protect Nosek’s right to cure before Ameriquest could be sanctioned for a violation of an order of the bankruptcy court.
 
 [16]
 
 In the absence of such specificity, there was no violation of
 
 *50
 
 § 1322(b) or the Plan and therefore no basis upon which to award Nosek damages under § 105(a). Because the bankruptcy court’s judgment in the adversary proceeding is vacated, the order confirming No-sek’s Third Amended Plan, which was based on the erroneous damages award, also must be vacated.
 

 Specifically, we
 
 vacate
 
 the district court’s judgment affirming the bankruptcy court’s judgment in the adversary proceeding and
 
 remand
 
 that proceeding to the bankruptcy court for dismissal. We also
 
 vacate
 
 the district court’s judgment affirming the confirmation of the Third Amended Plan, and
 
 remand
 
 that matter to the bankruptcy court with instructions to vacate its order confirming that Plan.
 

 So ordered. Each party shall bear its own costs.
 

 [1]
 

 . Nosek disputes that she was behind on three payments at this time. She claims she was only two payments in arrears.
 

 [2]
 

 . The affidavit was submitted in November 2004 in response to a court order requiring Ameriquest to explain its use of suspense accounts generally and in connection with No-selc's account. This order is discussed more fully
 
 infra.
 

 [3]
 

 . Because Nosek maintained a variable rate mortgage, Ameriquest would send her a letter every six months notifying her of the current interest rate and the exact amount due each month.
 

 [4]
 

 . In her complaint, Nosek alleged that Ameri-quest's conduct resulted in additional interest, late charges, and finance charges being imposed against her, and that it effectively denied her the opportunity to re-finance her mortgage on advantageous terms or to obtain a discharge in her bankruptcy case.
 

 [5]
 

 . The district court remanded the Chapter 93A claim with specific instructions:
 

 The Bankruptcy Court held that the violation of RESPA constituted a per se violation of chapter 93A.... While the Bankruptcy Court correctly applied Massachusetts law, the preemption of the underlying RESPA claim requires consideration of the chapter 93A claim. The Massachusetts General Law chapter 93A claim is, therefore, remanded to the Bankruptcy Court for reconsideration as to whether the Bankruptcy Code preempts such state claims and, if that court answers in the negative, for a determination of the claim on the merits.
 

 [6]
 

 . 11 U.S.C. § 105(a) states:
 

 The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.
 

 [7]
 

 . Because of this focus, we do not reach some unresolved questions under First Circuit Law — the appropriate burden of proof for civil contempt sanctions in the bankruptcy court and the availability of emotional distress damages under § 105(a).
 
 See, e.g., In re Pratt,
 
 462 F.3d 14, 21 (1st Cir.2006)(expressly declining to reach the issue of whether a violation of a bankruptcy court’s order must be established by a preponderance of the evidence or clear and convincing evidence, and collecting cases);
 
 In re Rivera Torres,
 
 432 F.3d 20, 27, 29 (1st Cir.2005) (stating that the First Circuit has not squarely ruled on the availability of emotional distress damages in the context of § 105(a)).
 

 [8]
 

 . We have upheld a bankruptcy court’s authority under § 105(a) in a variety of contexts.
 
 See, e.g., United States v. Mourad,
 
 289 F.3d 174, 176, 180 (1st Cir.2002) (upholding a bankruptcy court’s criminal contempt conviction against an individual for violating a court order prohibiting him from "entering the Eleventh Floor of the O’Neill [Court] Building ... until further order of th[e] Court”);
 
 Cuevas-Segarra v. Contreras,
 
 134 F.3d 458, 460 (1st Cir.1998) (affirming the court’s decision under § 105(a) to order a party to return fees improperly received from a settlement).
 

 [9]
 

 . Chapter 13 of the Bankruptcy Code treats an individual’s interest in her residence differently than her other assets in order to "encourage the flow of capital into the home lending market.”
 
 Nobelman,
 
 508 U.S. at 332, 113 S.Ct. 2106 (Stevens, J., concurring);
 
 see In re Ferandos,
 
 402 F.3d 147, 151 (3d Cir.2005) ("[T]he true ... intent behind the § 1322(b)(2) exception ... is to protect the traditional mortgage lender who provides long-term financing that enables individuals to purchase their home.” (quoting
 
 In re Williams,
 
 109 B.R. 36, 42 (Bankr.E.D.N.Y.1989)));
 
 see also In re LaFata,
 
 483 F.3d 13, 18-19 (1st Cir.2007).
 

 [10]
 

 . Section 1322(b)(5) states:
 

 [Notwithstanding paragraph (2) of this subsection, [the plan may] provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due[.]
 

 [11]
 

 .Ameriquest challenges this statement, asserting that all Chapter 13 bankruptcy plans are not administered in a uniform manner. Because of this lack of uniformity, Ameriquest asserts that there may be delays in accounting for pre- and post-petition payments and making internal debits and credits between the petitioner’s suspense account and her main account.
 

 [12]
 

 . As part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Congress added a new provision to the Bankruptcy Code, § 524(i), which provides an explicit remedy for certain creditor violations related to Chapter 13 plans. The provision states:
 

 The willful failure of a creditor to credit payments received under a plan confirmed under this title, unless the order confirming the plan is revoked, the plan is in default, or the creditor has not received payments required to be made under the plan in the manner required by the plan (including crediting amounts required under the plan), shall constitute a violation of an injunction under subsection (a)(2) if the act of the creditor to collect and failure to credit payments in the manner required by the plan caused material injury to the debtor.
 

 11 U.S.C. § 524(i); see
 
 also
 
 4
 
 Collier
 
 ¶ 524.08. Because Nosek’s claim was filed prior to the provision’s effective date — October 17, 2005— it does not apply to this case.
 

 [13]
 

 . 11 U.S.C. § 524(c) states:
 

 (c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankrupt-cy law, whether or not discharge of such debt is waived, only if—
 

 (1) such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;
 

 (2) the debtor received the disclosures described in subsection (k) at or before the time at which the debtor signed the agreement;
 

 (3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that—
 

 
 *47
 
 (A) such agreement represents a fully informed and voluntary agreement by the debtor;
 

 (B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and
 

 (C) the attorney fully advised the debtor of the legal effect and consequences of—
 

 (i) an agreement of the kind specified in this subsection; and
 

 (ii) any default under such an agreement;
 

 (4)the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;
 

 (5) the provisions of subsection (d) of this section have been complied with; and
 

 (6) (A) in a case concerning an individual who was not represented by an attorney during the course of negotiating an agreement under this subsection, the court approves such agreement as—
 

 (i) not imposing an undue hardship on the debtor or a dependent of the debtor; and
 

 (ii) in the best interest of the debtor.
 

 (B) Subparagraph (A) shall not apply to the extent that such debt is a consumer debt secured by real property.
 

 [14]
 

 . It will often be difficult in cases like this for a court to determine whether a debtor's cure rights have been satisfied until the debt- or has met all of the obligations set forth in the confirmation plan. Congress has acknowledged this difficulty implicitly in § 524(i), which declares that a creditor has violated the debtor's discharge injunction if it "willfulüy] fail[s] ... to credit payments received under a [confirmed Chapter 13] plan ... if the act of the creditor to collect and failure to credit payments in the manner required by the plan caused material injury to the debtor.'' 11 U.S.C. § 524;
 
 see also In re Watson,
 
 384 B.R. 697, 705 (Bankr.D.Del.2008);
 
 In re Collins,
 
 07-30454, 2007 WL 2116416, at *4 (Bankr.E.D.Tenn. July 19, 2007). The provision grants the debtor a cause of action only once she has satisfied the terms of the Chapter 13 plan and received a discharge injunction pursuant to § 524. 11 U.S.C. § 524(i);
 
 see also In re Collins,
 
 2007 WL 2116416, at *4 (noting that § 524(i) provides debtors a “potential remedy, post-discharge, if a creditor has failed to honor the terms of a confirmed plan by not properly crediting payments received as required by the plan.”).
 

 [15]
 

 . Congress's enactment of § 524(i) of the Bankruptcy Code confirms the widespread nature of these problems and the difficult issues that courts have faced addressing them.
 

 [16]
 

 . In saying that the Plan would have to be amended to prescribe the accounting practices necessary to protect Nosek’s right to cure before Ameriquest could be sanctioned for a violation of an order of the bankruptcy court, we do not suggest that the bankruptcy court should have engaged in a company-wide revision of Ameriquest's corporate accounting practices. Under the facts of this case, a simple amendment to the Plan clarifying how Ameriquest must account for short, late, or missed pre- and post-petition payments from Nosek or the trustee during the course of the repayment period would have sufficed.