Nectarios FATSIS, a/k/a Nick Fatsis, Debtor.

Nectarios Fatsis, Appellant,

v.

Joseph Braunstein, Chapter 7 Trustee, Appellee.

BAP No. BP 08–091.
Bankruptcy No. 03–19121–FJB.

United States Bankruptcy
Appellate Panel
for the First Circuit.

May 4, 2009.

2

David G. Baker, Esq., on brief for Appellant.

**4**

Mark W. Corner, Esq., on brief for Appellee.

Before VAUGHN, KORNREICH, and TESTER, United States Bankruptcy Appellate Panel Judges.

PER CURIAM.

Nectarios Fatsis (the "Debtor") appeals from the bankruptcy court's order finding him in contempt and imposing monetary sanctions against him for selling property of the estate without court permission in violation of the order confirming his chapter 13 plan. For the reasons set forth below, we affirm.

## BACKGROUND

The Debtor filed a chapter 13 petition, and on his bankruptcy court schedules, he listed as an asset 1,000 shares of EMC stock (the "Stock"), which he valued at $12,000. The Debtor did not exempt any portion of the Stock. At his § 341[1] meeting, the Debtor testified that the Stock was in a brokerage account held at Scottrade, together with other estate assets (cash) that the Debtor had deposited into the account.

The Debtor's plan called for a contributions totaling $36,650 payable in twelve regular monthly payments of $150 plus a lump sum payment of $34,850 due "on or before the twelfth month of the plan." The confirmation order (the "Confirmation Order") stated specifically that the lump payment sum was to have come from the proceeds of sale of real property located in Lynn, Massachusetts. The Confirmation Order also contained the following anti-alienation clause:

Unless otherwise ordered by the Court, all property of the estate as defined in 11 U.S.C. §§ 541 and 1306 including, but not limited to, any appreciation of the value of real property owned by the debtor as of the commencement of the case, shall remain property of the estate during the term of the plan and shall vest in the debtor(s) only upon discharge. All property of the estate shall remain within the exclusive jurisdiction of the bankruptcy court. The debtor(s) shall not transfer, sell or otherwise alienate property of the estate other than in accordance with the confirmed plan or other order of the bankruptcy court. The debtor shall be responsible for preserving and protecting property of the estate.

The chapter 13 trustee moved to dismiss the case due to the Debtor's failure to complete the payments required by the plan. After a hearing, the bankruptcy court extended the term of the plan and ordered the Debtor to pay the arrears as follows: $17,500 by April 15, 2005 and $17,950 by May 31, 2005. The day before the first payment was due, the Debtor sought an extension of time, which the bankruptcy court granted, ordering that: "the $17,500 payment that had been due on April 15, 2005 shall be paid in two parts: $10,000 by April 29, 2005 and $7,500 by May 10, 2005."

On April 21, 2005, the Debtor, without any notice or bankruptcy court authorization, sold the Stock for $13,332.43. Thereafter, the Debtor remitted three cashier's checks to the chapter 13 trustee as follows: $10,000 on May 10, 2005; $7,500 on May 19, 2005; and $10,000 on August 11, 2005. Although the Debtor testified that he sold the Stock to raise money to pay the chapter 13 trustee in order to avoid dismissal of

---

1. Unless otherwise noted, all references to the "Bankruptcy Code" or to statutory sections are to the Bankruptcy Reform Act of 1978, as amended prior to April 20, 2005, 11 U.S.C. §§ 101, *et seq.*

his case, he never informed the bankruptcy court of his intention, nor is there any evidence in the record as to what, in fact, happened to the $13,332.43 in stock proceeds. Moreover, the Debtor's statement is undermined by the fact that he also claims that two other individuals loaned him money so that he could make payments to the chapter 13 trustee.[2] However, between the alleged loans, and the proceeds from the sale of the Stock, the Debtor received a total of $65,814.43, yet paid only $28,700 to the chapter 13 trustee. There is no evidence in the record as to what happened to the other $37,114 the Debtor received.

In November, 2007, the Debtor's case was converted to chapter 7, and the appellee, Joseph Braunstein, was appointed as the trustee (the "Trustee"). After learning that the Debtor had sold the Stock without bankruptcy court authorization, the Trustee filed a motion (the "Motion for Contempt") asking the bankruptcy court to hold the Debtor in contempt for violating the Confirmation Order, and to impose sanctions of $19,000, the value of the Stock on the conversion date.

The Debtor objected on grounds that § 1306(b) permitted him to possess the Stock and use proceeds of the sale to fund his plan. He argued that the anti-alienation clause was put in the Confirmation Order to prohibit the sale of assets like real estate or automobiles without court approval and that it had no bearing on his use of the Stock. He likened his unfettered use of the Stock to the drawing of a check against a payroll deposit, an action that would have gone unchallenged by the Trustee. He also objected to the amount of the sanctions award demanded by the Trustee.

After an evidentiary hearing, the bankruptcy court entered an order granting the Motion for Contempt and ordering the Debtor to pay $13,332.43 (the sale price of the Stock) to the Trustee ("Sanctions Order"). In its Findings of Fact and Conclusions of Law, the bankruptcy court stated as follows:

> Both the Code and the confirmation order are clear: the Debtor was required to preserve and protect the estate's property, including the Stock. Section 105(a) of the Bankruptcy Code permits the Court to impose sanctions for the Debtor's failure to abide by the Code and the confirmation order. *Jamo v. Katahdin Federal Credit Union (In re Jamo)*, 283 F.3d 392 (1st Cir.2002); *In re Paige*, 365 B.R. 632 (Bankr.N.D.Tex. 2007). Although the Court is aware that the Debtor was not represented by his former counsel and was acting pro se when he sold the Stock, the Court also notes that during this same period, the Debtor filed several pleadings, including for extensions of time to make plan payments, without informing the Court that he intended to sell the Stock to make the payments. More importantly, the Debtor's testimony that he devoted all of the proceeds from the sale of the Stock is not credible as he also testified that he only repaid Effie Messados and Anastasios Fatsis amounts which they had loaned him to pay to the Chapter 13 Trustee. The amounts he received,

**2.** The only evidence in the record of the alleged loans is a HUD–1 settlement statement generated at the closing for the sale of the Debtor's real property in Somerville, Massachusetts in December, 2006. According to the HUD statement, Effie Messados and Anastasios Fatsis received $29,000 and $23,482.93

respectively from the sale proceeds. The Debtor asserts that they had each loaned him money so that he could make payments to the chapter 13 trustee, and that the money they received from the sale proceeds was in repayment of those loans.

**6**

however, exceed what he paid to the Chapter 13 Trustee. His actions were undertaken in bad faith and appear to be motivated by an attempt to pay what was needed to avoid dismissal of the case but less than the full amount he received, including from non-exempt assets.

This appeal followed.

### JURISDICTION

■■■ Before addressing the merits we are required to assess our jurisdiction. This is so even when, as in this case, no party has raised a jurisdictional challenge. *See Boylan v. George E. Bumpus, Jr. Constr. Co., Inc. (In re George E. Bumpus, Jr. Constr. Co.)*, 226 B.R. 724, 725–26 (1st Cir. BAP 1998). We have jurisdiction to hear appeals from final judgments, orders and decrees of the bankruptcy court.[3] Also, subject to our discretion, we may hear appeals from certain interlocutory orders.[4] The current appeal is from a contempt order entered in a contested matter in the main bankruptcy case. As such, it presents us with a novel question of finality. Recently, the Bankruptcy Appellate Panel for the Ninth Circuit addressed the finality of such an order. *See Stasz v. Gonzalez (In re Stasz)*, 387 B.R. 271 (9th Cir. BAP 2008). The reasoning in *Stasz* is worthy of adoption:

> [Bankruptcy] Rule 9020 provides that motions for contempt in bankruptcy cases are contested matters governed by Rule 9014. In this case, the contested

matter alleging Debtor's contempt was the only matter before the court. The order entered resolving a contested matter has the status of a judgment under Federal Rule of Civil Procedure 58. Fed.R.Civ.P. 58, incorporated by Fed. R. Bankr.P. 9021. It follows that the court's award of sanctions was a final order that ended the particular contested matter.

*Id.* at 275 (footnote omitted). Thus we hold that the decision on appeal in this case is a final, appealable order.

### STANDARD OF REVIEW

■■■ A bankruptcy court's findings of fact are reviewed for clear error. *See T.I. Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir.1995). Conclusions of law are reviewed *de novo. Id.* A bankruptcy court's decision to grant relief under § 105(a) is reviewed for an abuse of discretion. *See 1500 Mineral Spring Assocs., LP v. Gencarelli*, 353 B.R. 771, 780 (D.R.I. 2006) (citing *Dept. Of Treasury v. Galarza Pagan*, 279 B.R. 43, 46 (D.P.R.2002)). A bankruptcy court will have abused its discretion if it "ignored a material factor deserving of significant weight, relied upon an improper factor or [made] a serious mistake in weighing proper factors." *Howard v. Lexington Inv., Inc.*, 284 F.3d 320, 323 (1st Cir.2002) (quoting *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988)).

---

**3.** *See* 28 U.S.C. § 158(a)(1); *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). A decision is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Id.* at 646 (citations omitted).

**4.** *See* 28 U.S.C. § 158(a)(3); *Fleet Data Processing Corp.* 218 B.R. at 645; *Flynn v. Bankowski (In re Flynn)*, 402 B.R. 437, 2009 WL

566438, n. 4 (1st Cir. BAP 2009). A decision is interlocutory if it "only decides some intervening matter pertaining to the cause, and requires further steps to be taken in order to enable the court to adjudicate the cause on the merits." *Fleet Data Processing Corp.* 218 B.R. at 645 (quoting *In re American Colonial Broad. Corp.*, 758 F.2d 794, 801 (1st Cir. 1985)).

## DISCUSSION

### I. Civil Contempt

 Section 105(a) of the Bankruptcy Code provides the bankruptcy court with broad authority to exercise its equitable powers to ensure compliance with its own orders. *See Ameriquest Mortg. Co. v. Nosek (In re Nosek)*, 544 F.3d 34, 43 (1st Cir.2008). Section 105(a) confers "statutory contempt powers" which "inherently include the ability to sanction a party." *Id.* at 43–44. A party alleging civil contempt must establish by clear and convincing evidence that a contemnor violated a court order. *See AccuSoft Corp. v. Palo*, 237 F.3d 31, 47 (1st Cir.2001) (citation omitted). The underlying order must be clear and unambiguous in its terms. *Id.* The test is whether the contemnor is "able to ascertain from the four corners of the order precisely what acts are forbidden." *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir.2002) (citations omitted). The "clear and unambiguous" standard is limited to an examination of the language of the order and does not include an inquiry into the legal efficacy of the order itself. *See id.*

 Here, the language of the Confirmation Order was clear and unambiguous. It provided, in relevant part: "The debtor(s) shall not transfer, sell or otherwise alienate property of the estate other than in accordance with the confirmed plan or other order of the bankruptcy court." Although the Debtor now takes issue with what he calls the "overly broad" language of the Confirmation Order, he did not appeal the Confirmation Order and is bound by its terms. In addition, it is well established that the "validity of [an] order is not open to collateral attack in a contempt proceeding for violating it." *Harris v. City of Philadelphia*, 47 F.3d 1333, 1337 (3d Cir.1995).

Prior to plan confirmation, the Stock, which the Debtor listed on his schedule of assets, constituted non-exempt property of the Debtor's estate. *See* 11 U.S.C. § 541. Pursuant to § 1327(b), property of the estate may vest in the debtor upon confirmation of a plan "[e]xcept as otherwise provided in the plan or in the order confirming the plan. . . ." The Confirmation Order specifically stated "[u]nless otherwise ordered by the court, all property of the estate . . . shall remain property of the estate during the term of the plan and shall vest in the debtor(s) only upon discharge." Therefore, under the express terms of the Confirmation Order, the Stock remained non-exempt property of the Debtor's estate after confirmation of his plan. By selling the Stock without bankruptcy court approval, the Debtor violated the clear and unambiguous terms of the Confirmation Order.

 Although the clear language of the Confirmation Order appears to end the inquiry, the Debtor argues that he should not have been held in contempt because he was not required to obtain the bankruptcy court's permission prior to selling the Stock. According to the Debtor, as a chapter 13 debtor, he had an inherent right to use and sell property of the estate in the "ordinary course of business," and, therefore, the language of the Confirmation Order should be interpreted in a way that is consistent with that exclusive right. He claims that the liquidation of the Stock to fund his plan payments falls within the ordinary course of business and cites § 1303 to support his argument.

The Bankruptcy Code gives a chapter 13 debtor certain rights over the bankruptcy estate. However, unlike a chapter 11 or chapter 12 debtor in possession, the Bankruptcy Code does not broadly confer upon the chapter 13 debtor all the rights and powers of the trustee. Instead, the Bank-

ruptcy Code provides a more limited grant of power. Under § 1303:

> Subject to any limitations on a trustee under this chapter, the debtor shall have, exclusive of the trustee, the rights and powers of a trustee under sections 363(b), 363(d), 363(e), 363(f), and 363(*l*), of this title.

11 U.S.C. § 1303. Because § 363(b) is specifically incorporated into § 1303, a chapter 13 debtor has the exclusive right to use, sell or lease property, *other* than in the ordinary course of business with leave of the court. *See* 11 U.S.C. § 363(b). In addition, pursuant to § 1304(b), a chapter 13 debtor who is "engaged in business," in the sense of being self-employed and incurring trade credit in the production of income from such employment, may exercise the powers of a trustee under § 363(c) to use property in the ordinary course of business without leave of the court. *See* 11 U.S.C. § 1304(b).

The bankruptcy court concluded that § 1303 was not applicable in this case because the right to use property of the estate in the ordinary course of business is found in § 363(c), a subsection not incorporated into § 1303. The Debtor claims that the bankruptcy court's analysis was flawed. First, he points out that § *363(b)* is explicitly incorporated into § 1303. Although his argument is not clear, the Debtor appears to argue that because a chapter 13 debtor may sell property of the estate *other* than in the course of ordinary business *with* leave of the court pursuant to § 363(b), he may also by inference sell property of the estate *in* the ordinary course of business *without* leave of court. There is no legal support for such an inference.

Moreover, as noted above, § 1304, and not § 1303, is the section that grants chap-

ter 13 debtors the trustee's rights and powers under § 363(c) to use property of the estate *in* the ordinary course of business, yet the Debtor did not cite to or rely upon this section at all. Section 363(c) provides that if the debtor is authorized to operate his business, the trustee is authorized to sell or use property of the estate in the ordinary course of business without notice or a hearing. *See* 11 U.S.C. § 363(c). Clearly, this section explicitly applies to chapter 13 debtors engaged in business.[5] However, the bankruptcy court determined that the Debtor was not "engaged in business" and there is no evidence in the record that the bankruptcy court's finding was erroneous.

The Debtor concedes that he was not engaged in any form of business. He argues, however, that chapter 13 debtors who are *not* engaged in business have an *inherent* right to use property in the ordinary course of their affairs and cites as support *Bogdanov v. Laflamme (In re Laflamme)*, 397 B.R. 194, 205 (Bankr.D.N.H. 2008). In *Laflamme,* the chapter 7 trustee attempted to recover property of the estate that the debtor had used prior to the conversion to chapter 7. The bankruptcy court noted that § 363(d) (which is incorporated into § 1303) empowers a trustee to sell, use or lease property of the estate under § 363(b) and (c), subject to certain limitations imposed by § 362. Therefore, subject to those limitations, "a chapter 13 debtor authorized to continue in business [under § 1304] is also empowered to use, sell or lease property of the estate in the ordinary course of business, without notice or a hearing." *Laflamme*, 397 B.R. at 205 (citing 8 Lawrence P. King, *Collier on Bankruptcy* ¶ 1303.03[1] (15th ed. rev. 2008)). The bankruptcy court then deter-

---

**5.** A debtor engaged in business is one who is "self-employed and incurs trade credit in the production of income from such employment...." 11 U.S.C. § 1304(a).

mined that a chapter 13 debtor *not* engaged in business under § 1304 should have the same rights and powers to use property of the estate, stating:

> Congress apparently felt that there was no need to explicitly state the right of a nonbusiness chapter 13 debtor to use property in the ordinary course of the debtor's affairs, since section 1306(b) expressly authorizes the chapter 13 debtor to retain possession of all property of the estate. It seems extremely doubtful that Congress would have intended to require notice and a hearing as a prerequisite to the normal use of property of the estate, including postpetition earnings, household goods, vehicles and residential property, in a case commenced by a debtor not engaged in business. The administrative burdens and uncertainties attendant upon such a radical departure from Chapter XIII practice [under the former Bankruptcy Act of 1898] would be a substantial deterrent to chapter 13 use by nonbusiness debtors.

*Id.* at 204–205 (quoting 8 *Collier on Bankruptcy* ¶ 1303.02). The bankruptcy court determined that the chapter 13 debtor's right to use or lease property in the ordinary course of his affairs is also implicit in § 1306(b), which provides that the debtor has the right to possession of all property of the estate, except as otherwise provided by a confirmed plan. *Id.* at 205. The bankruptcy court concluded, therefore, that §§ 1303 and 1306(b) together provide chapter 13 debtors not engaged in business an inherent right to use property of the estate for ordinary and necessary living expenses provided that the use is not in bad faith. *Id.*

 We conclude that *Laflamme* is distinguishable from the case before us. In *Laflamme*, the chapter 13 plan was never confirmed and, therefore, there was no provision in a confirmation order prohibiting the debtor from selling property of the estate. Despite this distinction, the Debtor, relying upon *Laflamme*, argues that he had this inherent right and that the sale of the Stock was in the ordinary course of his affairs because he used the money to pay his basic living expenses and to make payments to the chapter 13 trustee. However, even if the Debtor's reliance on *Laflamme* is warranted and he does, in fact, have such an inherent right, the transfer must still be a routine, ordinary course of business transfer. "[E]xtraordinary purchases, sales and credit transactions … require court approval." *Fisher,* 198 B.R. at 733.

The Bankruptcy Code does not define "ordinary course of business." However, courts have fashioned (in various contexts) a test to determine whether a transaction was in the ordinary course of business. The Debtor advocates a two-prong test, citing *Boyer v. Gildea,* 374 B.R. 645 (N.D.Ind.2007):

> A transaction is in the ordinary course of business only if it is "most likely" the case that (1) the transaction does not expose "a hypothetical creditor to economic risks different from those accepted when such creditor initially extended credit to the debtor," and (2) the transaction at issue is comparable to the types of transactions entered into by similar businesses. A creditor's reasonable expectations are "based in large part upon the debtor's specific pre-petition business practices and norms and the expectation that the debtor will conform to those practices and norms while operating as a debtor-in-possession," and therefore, a "fundamental characteristic of an 'ordinary' post-petition business transaction is its similarity to a prepetition business practice."

*Id.* at 651–52 (citations omitted). The Debtor argues that in this case, "... the question becomes whether there was anything about the transaction at issue that was different from the type of transactions entered into by other individuals." However, the Debtor completely ignores the fact that the two-prong test compares the transaction at issue with comparable transactions entered into by similar *businesses,* and examines whether the transaction at issue exposes a hypothetical creditor of the *business* to risks different than the risks when credit was first extended. Such a comparison is not possible here because the bankruptcy court concluded correctly that the Debtor was not in the business of selling stock.

The Debtor claims that the bankruptcy court's understanding of "ordinary course of business" results from "constru[ing] the statute too narrowly." He prefers a reading that would enlarge the meaning of "ordinary course of business" in a chapter 13 to include all actions taken by a debtor in the ordinary course of his or her affairs. To support this argument, he points out that a debtor is ordinarily free to deposit a payroll check into a checking account and then draw checks to purchase groceries and make plan payments. He then insists that his use of the Stock was equally ordinary. This argument fails on the facts. The application of the Stock proceeds to the balance due under the plan was not a routine or ordinary event by any stretch of the imagination.

The plan provided for twelve small monthly payments and one large lump sum payment. That lump sum payment was to have been made from the proceeds of sale of the Lynn property. The sale of the Lynn property appears in the Confirmation Order as an exception to the anti-alienation clause. The Debtor's claim that the Stock proceeds were applied to the lump sum payment suggests that they were used as an extraordinary substitute for the Lynn proceeds without court approval. For that reason, the bankruptcy court was correct in holding such use to be a violation of the Confirmation Order.

## II. Sanctions Amount

Federal courts are empowered to issue civil contempt sanctions to "protect[ ] the due and orderly administration of justice and ... maintain[ ] the authority and dignity of the court." *Goya Foods,* 290 F.3d at 78. "A trial court has wide discretion in its choice of sanctions," and "[o]nce the trial court has chosen a particular sanction, appellate review is for abuse of discretion." *Id.* ("When money is the sanction of choice, the abuse of discretion standard pertains not only to the trial court's selection of the sanction but also to its quantification of the award").

Monetary sanctions assessed for the purpose of compensating for losses sustained are permissible in civil contempt proceedings. *Id.* Therefore, "make-whole relief" is a commonplace sanction for civil contempt. *Id.* "The amount of an award of make-whole relief, like the amount of any monetary sanction that is remedial in nature, cannot be plucked out of thin air." *Id.* Rather, the amount of such a sanction must be established by competent evidence, and must bear a reasonable relationship to the actual losses sustained by the injured party. *Id.*

Compensation for losses is not the only factor to be considered, however, because "[s]anctions stem, in part, from a need to regulate conduct during litigation." *Goya Foods, Inc. v. Wallack Mgmt. Co.,* 344 F.3d 16, 19 (1st Cir.2003) (revisiting contempt sanction discussed in *Goya Foods,* 290 F.3d at 78). Thus, setting the amount of an effective sanction may in-

clude punitive concerns as well as considerations of deterrence. *Id.* at 20–21.

The bankruptcy court ordered the Debtor to pay the Trustee the sum of $13,332.43, the sale price of the Stock. The Debtor argues that the bankruptcy court erred in imposing sanctions against him because he used the proceeds from the sale of the Stock to pay the Trustee, and the Trustee has "already received the property to which he is entitled." According to the Debtor, the sanction results in a "double recovery" for the Trustee because the Trustee already obtained possession of the Scottrade account, plus the $13,332.43 in Stock proceeds in the form of plan payments. However, there is no evidence in the record which conclusively establishes that the Debtor actually paid all or even some of the $13,332.43 to the Trustee. Without such evidence, we cannot conclude that the sanctions in this case result in a double recovery by the Trustee.

In addition, the Debtor's use of the proceeds from the sale of the Stock to fund his chapter 13 plan did not relieve him of the consequences arising from the unauthorized sale of the Stock. *See Fitzgerald v. Beesley (In re Beesley),* 139 B.R. 247, 248 (Bankr.D.Idaho 1992). Therefore, sanctions were appropriate. In light of the foregoing, we conclude that the bankruptcy court did not abuse its discretion in ordering sanctions in the amount of $13,332.43.

## CONCLUSION

For the reasons set forth above, the Sanctions Order is **AFFIRMED.**